RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0095p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

THOMAS A. SWEENEY,

*Defendant-Appellant*.

No. 17-3768

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:16-cr-00073-1—Michael H. Watson, District Judge.

Decided and Filed:  May 25, 2018

Before:  GIBBONS, BUSH, and LARSEN, Circuit Judges.

────────────────

## COUNSEL

────────────────

**ON BRIEF:**  Kevin M. Schad, FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant.  Benjamin C. Glassman, Heather A. Hill, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

────────────────

## OPINION

────────────────

JOHN K. BUSH, Circuit Judge.  Defendant Thomas Sweeney appeals his conviction and sentence for production and receipt of child pornography, attempted enticement of a minor to engage in sexual conduct, and commission of a sex offense against a minor while being required

to register as a sex offender. For the reasons explained below, we affirm his conviction and sentence.

**I**

Sweeney's parental rights over his daughter, T.R., were terminated after he was convicted of raping his niece, and he had no contact with T.R. during his ten-year imprisonment. Upon his release from prison in 2013, Sweeney began contacting T.R. via Facebook and text message. By June 2015, when T.R. was 14, their communications had turned sexual and included the mutual sending of explicit pictures, detailed discussion of sex acts, and ultimately unconsummated plans to meet for the purpose of engaging in sexual acts.

T.R. alerted her adoptive parents to the nature of her conversations with Sweeney, and they alerted officers from the Department of Homeland Security, who alerted Sweeney's parole officer. During a meeting with his parole officer, Sweeney indicated that he owned a cellular telephone that he had left at the homeless shelter where he lived. The parole officer told waiting DHS officers about this telephone and that Sweeney was planning on going to a hospital. A parole officer, accompanied by the DHS officers, went to the homeless shelter, located the telephone, and secured the phone's media-storage card, which DHS officers later searched pursuant to a warrant.

After a jury trial at which evidence from the media-storage card was admitted, Sweeney was convicted on all counts and received a carceral sentence of fifty-five years.

**II**

Sweeney makes three arguments on appeal. First, he contends that the district court erred in admitting evidence derived from the media-storage card, which he argues was obtained in violation of the Fourth Amendment. Second, Sweeney claims that the trial court erred by applying a two-level enhancement under USSG § 2G2.1(b)(5), which applies when the defendant is the "parent" of the victim; Sweeney argues he was not T.R.'s parent after his parental rights were terminated. And finally, he maintains that his sentence was procedurally unreasonable for

the district court's failure to address various mitigation arguments that Sweeney raised at sentencing.

* * *

On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004). We may overturn a district court's denial of a motion to suppress only if the defendant has met his burden to show "a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (citation omitted).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Though "this fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer," there are "exceptions to the general rule that a warrant must be secured before a search is undertaken." *California v. Carney*, 471 U.S. 386, 390 (1985).

One such exception allows warrantless searches so long as they are pursuant to a constitutional state law authorizing the warrantless searches of parolees and their residences. *See Samson v. California*, 547 U.S. 843, 856 (2006). We have already held that Ohio R.C. § 2967.131(C), the law authorizing the warrantless search of Sweeney's residence, is constitutional, *see United States v. Loney*, 331 F.3d 516, 521 (6th Cir. 2003), and Sweeney does not contest that the search was pursuant to the requirements of that statute.

He argues instead that we should apply an exception to the exception and disallow this search because the parole officer who searched Sweeney's domicile was impermissibly acting as a "stalking horse" to help the DHS officers evade the Fourth Amendment's warrant requirement in their investigation into Sweeney.

The prohibition on law-enforcement officers' using parole officers as "stalking horses" for their own investigations stems from a line of cases starting with *Griffin v. Wisconsin*,

483 U.S. 868 (1987). *Griffin* justified warrantless searches of probationers based on the "special needs" of a state in administrating its system of probation, just as the special needs of administering a penal system limit the requirements of the Fourth Amendment in the prison context. *Id.* at 873–77. Because the exception to the warrant requirement is predicated on the special needs inherent in a system of probation, the search must be related to those needs and not merely an instance of law-enforcement officers' using a parole officer as a stalking horse to assist in an unrelated investigation. *See United States v. Goliday*, 145 F. App'x 502, 505 (6th Cir. 2005).

More recently, however, the Supreme Court has grounded this exception in the lower expectation of privacy enjoyed by probationers, which is weighed against the promotion of legitimate governmental interests to determine whether the search was reasonable under "the totality of the circumstances." *Samson*, 547 U.S. at 849–52. Because this justification for the exception is not always related to the special needs of the probationary system, the reason for conducting the search need not necessarily be related to those needs either.

When the government relies on the "special needs" doctrine to justify a search, the stalking horse exception may still apply, but when the government relies on the totality-of-the-circumstances doctrine as articulated in *Samson*, it does not. *See United States v. Lykins*, 544 F. App'x 642, 647 n.2 (6th Cir. 2013). Because the district court explicitly relied on the doctrine in *Samson*, and because the state defends the search on those grounds, the stalking-horse exception does not apply.

Regardless, there is no reason to think that the parole officer was acting as a stalking horse for the DHS officers. Under the "special needs" doctrine, the stalking-horse exception only prevents probation officers from assisting law enforcement in evading the Fourth Amendment's warrant requirement—it allows that "police officers and probation officers can work together and share information to achieve their objectives." *United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994).

Here, the parole officer who searched Sweeney's residence had every parole-related reason to do so—he had recently been informed by DHS officers that Sweeney was exchanging

explicit pictures with his daughter, a clear violation of the terms of his parole, which he had been sentenced to as a result of his conviction for raping his niece. That DHS also wanted access to Sweeney's phone does not detract from the parole officer's legitimate interest in searching it.

In short, the stalking-horse exception to the general rule allowing parole officers to search a parolee's residence does not apply when, as here, that search is reasonable under the totality of the circumstances, as authorized by *Samson*, and even if it did apply, the parole officer was not acting as a stalking horse.

\* \* \*

At sentencing, the district court applied a two-level enhancement to Sweeney's Guidelines range under USSG § 2G2.1(b)(5), which applies if "the defendant was a parent, relative, or legal guardian of the minor involved in the offense, or if the minor was otherwise in the custody, care, or supervisory control of the defendant."

The appropriate interpretation of USSG § 2G2.1(b)(5) is a legal issue, which we review de novo. *See, e.g.*, *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012). The factual findings required to determine whether Sweeney fell within USSG § 2G2.1(b)(5), appropriately interpreted, are reviewed for clear error. *United States v. Hodge*, 805 F.3d 675, 678 (6th Cir. 2015) (citing *United States v. Maken*, 510 F.3d 654, 656–57 (6th Cir. 2007)).

Sweeney's position is that he is not T.R.'s parent, as the term is used in USSG § 2G2.1(b)(5), because his parental rights over T.R. had been terminated before the offense.

In support of his argument, he points to the text of the enhancement, which describes several enumerated categories—parents, relatives, and legal guardians—and also applies the enhancement to anyone who "otherwise [has] custody, care, or supervisory control" of the victim. Sweeney reads the term "otherwise" as requiring that the preceding enumerated categories be limited such that only people who have custody, care, or supervisory control count as parents, relatives, or legal guardians for purposes of § 2G2.1(b)(5).

Additionally, Sweeney cites the "Reason for Amendment" offered by the Sentencing Commission for § 2G2.1(b)(2),[1] which tells us that this section was added "to provide an increase for defendants who abuse a position of trust in exploiting minor children." USSG app. C, amend. 324 (2003). Not all parents are in a position of trust relative to their children, says Sweeney, inviting us to imagine a biological parent who gives up his biological child for adoption and has no subsequent relationship with that child, against whom the biological parent then offends. Arguing that this hypothetical parent should not be subject to the enhancement, Sweeney concludes that we should limit the definition of "parent, relative, or legal guardian" to those who have custody, care, or supervisory control over the victim, because anyone who has custody, care, or supervisory control over a child is in a position of trust.

We are unconvinced that USSG § 2G2.1(b)(5) only applies to parents, relatives, or legal guardians who have custody, care, or supervisory control over their victims. Because anyone who has custody, care, or supervisory control over a victim is already subject to the enhancement, this would render the terms "parent," "relative," and "legal guardian" superfluous, and we are "'reluctan[t] to treat statutory terms as surplusage' in any setting."[2] *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (alteration in original) (quoting *Babbitt v. Sweet Home Chapter of Cmties. For a Great Or.*, 515 U.S. 687, 698 (1995)).

What, then, is the correct definition of "parent?"[3] "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). The term "parent" is normally used to refer to the progenitors of a child, as well as anyone who has taken

---

[1]USSG § 2G2.1(b)(2) later became USSG § 2G2.1(b)(5).

[2]When confronted with very similar language in a different context, the Supreme Court came to the same conclusion. *See Taylor v. United States*, 495 U.S. 575, 597 (1990). In *Taylor*, the Court interpreted the term "burglary" as it appears in 18 U.S.C. § 924(e)(2)(B), which defines "violent felony" as, among other things, a crime that "is burglary, arson, or extortion, involves use of explosives, or *otherwise* involves conduct that presents a serious potential risk of physical injury to another" (emphasis added).

[3]Because the government does not argue that Sweeney was T.R.'s relative or legal guardian, we do not define those terms.

on the role traditionally reserved for those progenitors, such as a stepfather.[4] One can be a parent in this sense without having parental rights over one's child.

Sweeney argues that in addition to biological parentage, the enhancement requires that the defendant must have also abused a position of trust, citing the Guidelines commentary earlier noted. He argues that, here, there was no position of trust between himself and T.R. But, as explained below, even applying the definition that Sweeney asks us to adopt—and it seems clear that, as used in § 2G2.1(b)(5), "parent" includes at least the child's biological father who abuses a position of trust—the district court did not clearly err in finding that the enhancement applies in this case. We need not decide, therefore, whether a biological relationship alone between the perpetrator and the victim would be sufficient for the "parent" enhancement to apply.

The district court applied § 2G2.1(b)(5) because T.R. "saw [Sweeney] in [his] biological father role despite the fact that she'd been adopted." While the district court used the term "biological," it applied the enhancement because of the *role* Sweeney was playing in T.R.'s life, not the mere fact that she was his biological daughter.[5]

In determining whether the district court clearly erred in finding that Sweeney is T.R.'s parent under § 2G2.1(b)(5), we must be mindful that the Sentencing Commission directed that the enhancement "have broad application." USSG § 2G2.1(b)(5), cmt. n.5. The trial transcript is replete with testimony showing that Sweeney had reestablished his parental relationship with T.R. and was therefore in a position of trust relative to her. The district court did not clearly err in finding that their relationship fell within the broad application of § 2G2.1(b)(5).

---

[4] *See, e.g.*, *Oxford English Dictionary*, *Parent*, http://www.oed.com/view/Entry/137816?rskey=h61fNd&result=1&isAdvanced=false#eid ("A person who is one of the progenitors of a child; a father or mother. Also, in extended use: a woman or man who takes on parental responsibilities towards a child, e.g. a stepmother, an adoptive father.").

[5] Further supporting our view that the district court's application of the enhancement was not predicated solely on the biological relationship between Sweeney and T.R., the district court invited "the Circuit to clarify whether a biological father is an appropriate application of this guideline, but I believe it is in this case." Had the district court been of the opinion that being the biological father of the victim was sufficient simpliciter, it would not have said that it was sufficient *in this case*. In the context of the sentencing transcript, clearly the district court thought that it was sufficient in this case because of the familial relationship that had developed between Sweeney and T.R. beyond their biological relationship.

Sweeney and T.R. were in periodic contact for approximately two and a half years. T.R. described their relationship immediately prior to the criminal activity as "good, like friendly, like trying to see if we could be like father/daughter again." As the following example shows, the text-message conversations between the two support T.R.'s characterization of the relationship.

| T.R.: | "Leave me alone and forget about being lovers because it's not going to happen." |
|---|---|
| Sweeney: | "What! What did I do, love?" |
| T.R.: | "I don't want to be lovers. I just want you to be my dad, nothing more than a father." |

The record makes it clear that Sweeney had re-entered T.R.'s life as a father figure, even if he did not have custody, care, or supervisory control over her. The district court did not clearly err in finding that this was sufficient to show that Sweeney was T.R.'s parent for purposes of § 2G2.1(b)(5).

\* \* \*

Finally, Sweeney argues that his sentence is procedurally unreasonable because the district court failed to address various mitigating arguments he presented at sentencing.[6] In passing sentence, district courts must address legitimate mitigating arguments raised by the defendant. *See, e.g.*, *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010) ("When a defendant raises a particular[, nonfrivolous] argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." (alteration in original) (quoting *United States v. Gapinski*, 561 F.3d 467, 474 (6th Cir. 2009))). But we have been clear that district courts need not engage in a formulaic point-by-point refutation of a defendant's mitigation arguments; the district court discharges its duty so long as it "conduct[s] a meaningful sentencing hearing and truly consider[s] the defendant's arguments." *United States v. Gunter*, 620 F.3d 642, 646 (6th Cir. 2010).

---

[6]Sweeney also cursorily argues that his sentence is procedurally unreasonable because the district court "did not review or address on the record in any meaningful way [the] 18 U.S.C. § 3553(a) factors," although he fails to mention which factors he believes were inadequately reviewed or why their review was inadequate. Reviewing the record has convinced us that the district court considered the § 3553(a) factors adequately.

Sweeney admits we review this issue under the deferential plain-error standard. We are not convinced that the district court plainly failed to consider or adequately explain its rejection of any of the arguments Sweeney presented at sentencing.

Sweeney claims that the district court failed to address his argument that "the Sentencing Guidelines for these type [sic] of offenses themselves were skewed, and not commiserate [sic] with actual offense conduct," that "the instant offense was less appalling than some other offenses prosecuted under the statute," that "there would be a sentencing disparity if the court imposed a 45 year sentence," and that "a 30 year sentence was in effect a life sentence."

The district court, however, clearly considered these arguments. It granted that "this does seem to be a category of cases where there is growing agreement that perhaps the punishments are treated more harshly under the guidelines than with other types of criminal offenses" and indicated that it was "mindful of the need to avoid unwarranted sentencing disparities." It agreed with Sweeney that "this is not the worst offense the Court has seen." And it recognized that "[a] 35-year sentence may in fact be a life sentence."

While the district court did not engage in a point-by-point explanation of why each of the mitigation arguments did not further influence its decision,[7] the record shows that it considered each of these arguments and rejected each after a careful consideration of the appropriate § 3553(a) factors.

### III

For the foregoing reasons, we **AFFIRM**.

---

[7]The district court was moved, at least, by Sweeney's argument that more appalling offenses have been committed, crediting this fact with its having "chosen a sentence below the statutory maximum range."