In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 20-3191

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARK PRICE,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cr-00348 — **Jane Magnus-Stinson**, *Judge.*

---

ARGUED SEPTEMBER 14, 2021 — DECIDED MARCH 9, 2022

---

Before SYKES, *Chief Judge*, and EASTERBROOK and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. After a jury trial, Mark Price was convicted of unlawfully possessing firearms and ammunition as a felon. In this appeal he challenges the district court's denial of his motion to suppress evidence located during warrantless searches, arguing that federal law enforcement used parole officers as a "stalking horse" to circumvent the Fourth Amendment's protections. Price also contests the sufficiency

of the evidence underlying his convictions as well as the applicability of various sentencing enhancements.

**I**

Price shot and killed a man for which he was convicted of felony aggravated battery. He was convicted later of possessing a firearm as a felon. As a convicted felon, 18 U.S.C. § 922(g)(1) prohibits Price from possessing ammunition or firearms.

In January 2018, Price signed a conditional parole release agreement under which he agreed not to engage in any criminal conduct or possess any firearms or weapons. He also consented to "allow [his] supervising officer or other authorized officials of the Department of Correction to visit [his] residence and place of employment at any reasonable time." Price further agreed:

> I understand that I am legally in the custody of the Department of Correction and that my person and residence or property under my control may be subject to reasonable search by my supervising officer or authorized official of the Department of Correction if the officer or official has reasonable cause to believe that the parolee is violating or is in imminent danger of violating a condition to remaining on parole.

*Price and the Gun Dealer.* Over seven days in October 2018, Price caught the attention of law enforcement. Beginning on October 10, he visited a firearms and ammunition dealer, Indy Trading Post, and ordered a Ruger rifle magazine. Consistent with store policy, an employee ran a background check which revealed Price's previous felony convictions. The employee

contacted Special Agent Brian Clancy of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Over the next several days, Price called Indy Trading Post multiple times asking about his magazine order.

On October 16, Clancy and fellow ATF agents visited Indy Trading Post looking for Price. The agents waited for him, but he did not arrive, so they left. Price arrived later with his girlfriend, who lived with him at the time. He told a store worker that he wished to pick up the Ruger rifle magazine he had ordered. Unknown to Price, his order with the store's distributor had not been placed pending the ATF's investigation. Instead of an operable rifle magazine, the employee gave Price an inoperable magazine shell. While at the store, Price also purchased a box of .40 caliber ammunition and a holster and left with those items.

Price later called the store, complaining the magazine did not fit "his firearm." He arranged to return to the store. Clancy was contacted and informed of Price's purchases and plan. Clancy decided to disguise himself as a store employee for Price's return.

Price arrived at the store the following day, October 17, driving a Ford Escape and accompanied by a friend. Clancy posed as a store clerk while two other ATF agents hid in the back. Price expressed irritation to store staff that the magazine he had picked up the day before did not work. He and his friend wished to use the shooting range, and Price was interested in renting a firearm because "his 40 was too much" for his friend to wield. While examining rental firearms with staff, Price took possession of one of the weapons, examined it, brought it up into a shooting position, and then handed it

back. At that point Clancy escorted Price to a back room where ATF agents were waiting and arrested him.

*The Searches.* After Price was arrested, Clancy did not immediately apply for a search warrant. Instead, aware that Price was on parole, Clancy contacted the Indiana Department of Correction and told them that Price was in custody. Clancy had previously informed parole officers that he was investigating Price, and they were aware of Price's attempt to purchase the rifle magazine. In fact, on the day Price was arrested parole officers had already looked for Price at his place of work and had tentative plans to visit his residence.

After Clancy contacted state authorities, three parole officers arrived at Indy Trading Post and searched the Ford Escape that Price had driven to the store. It is unclear whether they searched at Clancy's request or of their own volition. According to one, Clancy had asked them to "initiate the investigation." But Clancy testified he "did not directly ask them to search the vehicle," but only "asked them to the scene so they could do their job." Regardless, as authorized by the parole agreement, the parole officers searched the vehicle and found a cocked and loaded Smith & Wesson .40 caliber pistol in the center console. Review of the firearm's serial number revealed that it was stolen. The parole officers notified Clancy about the weapon and he obtained and executed a search warrant for the vehicle. No further firearms were discovered in the car.

Following the search of the Ford Escape, Clancy and the parole officers drove Price to his residence where he lived with his girlfriend. There, parole officers conducted a search. Once again, it is unclear whether the parole officers initiated the search or whether Clancy requested that they do so. According to one parole officer, they "were asked to go" to

Price's home. But Clancy testified that the parole officers "want[ed] to conduct a search of the Defendant's residence," and that Clancy "followed" the parole officers back to Price's home. In any event, parole officers searched the residence with Price while Clancy waited outside.

During that search the parole officers discovered ammunition and immediately notified Clancy. Clancy then requested, received, and executed a search warrant for the home, a parked Oldsmobile van in the driveway, and an outbuilding. In the bedroom officers found mail addressed to Price. Officers also located .40 caliber ammunition purchased at Indy Trading Post, the receipt for that purchase, and a key to the Oldsmobile van, all in a TV stand in the same room. In the bedroom closet, in a toolbox, the officers also located a firearm, and various ammunition, including .223 caliber. A search inside the Oldsmobile van revealed a Ruger Mini .223 caliber rifle.

A federal grand jury indicted Price, a felon, with one count of unlawful possession of the .40 caliber ammunition he bought at Indy Trading Post, and two counts of unlawful possession of a firearm for the .40 caliber pistol found in the center console of the Ford Escape and the .223 caliber rifle discovered in the Oldsmobile van, all in violation of 18 U.S.C. § 922(g)(1).

*Motions to Suppress and Trial.* Before trial, Price moved to suppress the evidence obtained from the searches of the Ford Escape, the Oldsmobile van, and his residence. Price argued the warrantless parole searches violated the Fourth Amendment because the parole officers acted as a "stalking horse" on behalf of the ATF, allowing Clancy to circumvent typical warrant and probable cause requirements. The government

defended the search on multiple grounds. The stalking horse theory was obsolete, the government argued, and the search by the parole officers complied with the parole agreement because they had reasonable cause to believe Price had violated his parole conditions. Even if the stalking horse theory was valid, the government submitted it did not apply here because the parole officers followed standard procedures by conducting a search after receiving information giving rise to reasonable suspicion that Price had violated the terms of his parole. And regardless of the validity of the stalking horse theory, the government invoked the inevitable discovery doctrine because Clancy had probable cause and could have obtained a search warrant at the time he arrested Price, as well as because the Ford Escape would have been subject to an inventory search after Price's arrest.

The district court denied Price's motion to suppress and his request for an evidentiary hearing. After considering several Supreme Court precedents—including *Griffin v. Wisconsin*, 483 U.S. 868 (1987), *United States v. Knights*, 534 U.S. 112 (2001), and *Samson v. California*, 547 U.S. 843 (2006)—the court concluded that "the stalking horse theory has no application" to Price's case. Instead, the court framed the inquiry as "whether the Parole Officers' search of Mr. Price's vehicle and residence were reasonable under the circumstances." After weighing Price's diminished privacy expectations as a parolee against the government's heightened interest in supervising parolees, the court was satisfied that no Fourth Amendment violation took place.

Price renewed his motion to suppress during the two-day trial, but the court again denied his motion. After the government concluded its case on the second day of trial, Price

moved for acquittal on all three counts under Federal Rule of Criminal Procedure 29. The court denied the motion.

The jury convicted Price on all three counts. He renewed his motion for judgment of acquittal and moved for a new trial, arguing there was insufficient evidence to support the convictions. On Count 1, Price argued his parole agreement restored his right to possess ammunition because it was not listed as a prohibited item. For Count 2, Price maintained there was insufficient evidence to show that he was aware of the .40 caliber pistol's presence inside the Ford Escape or that he had the power and intention to exercise dominion and control over the firearm. And on Count 3, Price contended the government had failed to show a nexus between Price and the .223 caliber rifle found in the Oldsmobile van.

The district court denied Price's post-trial motions. The court ruled first that the parole agreement's "omission of express language regarding the prohibition of possessing ammunition does not affect Mr. Price's status as a prohibited person for the purposes of 18 U.S.C. § 922(g)," and thus Price's right to possess ammunition had not been restored by the parole agreement. The court also concluded that the government presented sufficient evidence for a reasonable jury to conclude that Price had constructively possessed both the .40 caliber pistol and the .223 caliber rifle. For the pistol, this included that Price had purchased .40 caliber ammunition, he referenced "his forty" at Indy Trading Post, and authorities found the firearm in the center console of the Ford Escape that Price had driven to the store before he was arrested. For the rifle, the jury heard that authorities found .223 caliber ammunition in Price's home, Price ordered a Ruger rifle magazine and contacted Indy Trading Post about the magazine's

functionality, and a weapon was recovered in the Oldsmobile van parked at Price's residence.

*Sentencing.* Price objected to three enhancements sought by the government under the Sentencing Guidelines. First, he objected to a two-level, multiple-firearms enhancement under U.S.S.G. § 2K2.1(b)(1)(A), arguing the government failed to establish that Price possessed three firearms. The court overruled Price's objection, finding that Price had briefly possessed a rental pistol at Indy Trading Post, in addition to the .40 caliber pistol and the .223 caliber rifle related to the underlying charges.

Second, Price objected to a two-level enhancement under U.S.S.G. § 2K2.1(b)(4)(A) for an offense involving a stolen firearm, arguing that he was unaware the .40 caliber pistol was stolen. The court concluded that this enhancement has no mens rea requirement, so it overruled Price's objection.

Third, Price objected to a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, which was predicated on Price's testimony at trial that he had never held or shot a firearm prior to October 17, 2018, and that he did not know how to tell whether a gun was loaded. At the sentencing hearing Price testified he had not intentionally misled the court, but rather he was "confused by the Government's line of questioning." The court rejected Price's testimony as false and applied the enhancement.

After the three enhancements were applied, Price's base offense level increased from level 20 to level 26, and his Guidelines Range moved from 51–63 months to 92–115 months. The district court sentenced Price to 92 months for

each of the three counts, to be served concurrently, followed by three years of supervised release.

On appeal, Price challenges the district court's denial of his motion to suppress, its rulings on the sufficiency of the evidence for Counts 2 and 3, and its imposition of the three sentencing enhancements.

## II

### A

Price primarily challenges the denial of his motion to suppress evidence obtained through two warrantless searches. "When reviewing a district court's decision denying a motion to suppress evidence, we review the court's legal conclusions *de novo* and its factual findings for clear error." *United States v. Wood*, 16 F.4th 529, 532–33 (7th Cir. 2021) (quoting *United States v. McGill*, 8 F.4th 617, 621 (7th Cir. 2021)).

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "[T]he reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Knights*, 534 U.S. at 118–19 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). A defendant's status as either a probationer or parolee "informs both sides of that balance." *Id.* at 119; *see Samson*, 547 U.S. at 850–57 (applying the *Knights* framework to parolees).

Two decisions guide our view of this balance of interests. In *Knights*, the Court examined the constitutionality of a warrantless search by law enforcement of a probationer's

apartment. 534 U.S. at 114. The Court assessed the privacy interests of the probationer, noting that "[p]robation is 'one point … on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service.'" *Id.* at 119 (quoting *Griffin*, 483 U.S. at 874). As a result, "probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *Id.* (quoting *Griffin*, 483 U.S. at 874). Additionally, the Court emphasized that the probationer was aware of the conditions in his probation agreement that authorized searches with or without a warrant or "reasonable cause," which "significantly diminished [the probationer's] reasonable expectation of privacy." *Id.* at 114, 120. In contrast, the Court in *Knights* stressed the government's legitimate interest in apprehending lawbreakers, noting the increased propensity of probationers to commit criminal activities and destroy incriminating evidence. *Id.* at 120. Accordingly, the Court held in *Knights* that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of [the] probationer's house." *Id.* at 121. "The same circumstances … render a warrant requirement unnecessary." *Id.*

Five years later, the Court applied the *Knights* framework to a warrantless search of a parolee in *Samson*. 547 U.S. at 846–47. The Court began by evaluating a parolee's privacy interests, determining that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id.* at 850. "[E]rgo, parolees enjoy even less of the average citizen's absolute liberty than do probationers." *Id.* (quoting *United States v. Cardona*, 903 F.2d 60, 63 (1st Cir. 1990)). The Court also outlined the privacy intrusions the state imposed on parolees, concluding that "[t]he extent and reach of these conditions

clearly demonstrate that parolees like petitioner have severely diminished expectations of privacy by virtue of their status alone." *Id.* at 852. And, as in *Knights*, the Court highlighted the terms of the parolee's agreement, which included a condition that permitted "suspicionless searches by a parole officer or other peace officer 'at any time'"—a condition that was "clearly expressed" to the parolee. *Id.* (cleaned up). In sum, these factors meant that the parolee "did not have an expectation of privacy that society would recognize as legitimate." *Id.* Conversely, the state had an "'overwhelming interest' in supervising parolees because 'parolees … are more likely to commit future criminal offenses.'" *Id.* at 853 (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 365 (1998)). The Court therefore held in *Samson* that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at 857.

Here, as in *Knights* and *Samson*, Price's status as a parolee reduced his privacy expectations and informed the government's legitimate interests. As a parolee his privacy expectations were diminished below even those of a probationer, since "parole is more akin to imprisonment than probation." *Samson*, 547 U.S. at 850. Price's parole agreement also included a provision that permitted parole officers to conduct a search based on "reasonable cause" rather than the Fourth Amendment's "probable cause" standard. At the same time, Price's status as a parolee gave the state an "overwhelming interest" in supervising him. This is especially true where, as here, parole officers had reason to believe that Price purchased .40 caliber ammunition and a rifle magazine, traveled to Indy Trading Post to use the shooting range, and was arrested by Clancy.

In response, Price attempts to distinguish these two deci-
sions. He retained a greater degree of privacy than the de-
fendants in *Knights* and *Samson*, Price believes, because their
respective probation and parole agreements permitted suspi-
cionless searches, while Price's agreement required "reasona-
ble cause." Although that assertion is true, Price's privacy ex-
pectations were nevertheless diminished by his status as a pa-
rolee and the "reasonable cause" search requirements of his
parole agreement. Price also does not dispute that parole of-
ficers had reasonable cause to search his property and resi-
dence based on facts known by the officials at the time of his
arrest. Even if Price's privacy expectations were slightly
higher than those of the defendants in *Knights* and *Samson*, the
state's interests in searching Price's property and residence
were markedly stronger. Unlike the defendant in *Knights*,
Price is a parolee, which gives the state an "overwhelming in-
terest" in his supervision.[1] And distinct from *Samson*, where
law enforcement conducted a search based "solely on peti-
tioner's status as a parolee," *Samson*, 547 U.S. at 846–47, the
parole officers here knew that Price was under arrest and had
likely violated the terms of his parole agreement. The State
had a heightened interest in protecting the public from Price.
That Price was under arrest at the time of the search did not
diminish that interest or increase Price's privacy expectations.

---

[1] Price attempts to minimize the state's heightened interest in regulat-
ing parolees as opposed to probationers, citing *State v. Vanderkolk*, 32
N.E.3d 775 (Ind. 2015), where the Supreme Court of Indiana purportedly
refused to distinguish between the two statuses. But to the extent *Vander-
kolk* collapsed the status distinction, it did so by reducing the privacy ex-
pectations of probationers, holding that "*Samson* is applicable to proba-
tioners" and that probationers may be subject to "warrantless and suspi-
cionless searches." *Id.* at 779; *see Wood*, 16 F.4th at 536 n.1.

*Wood*, 16 F.4th at 538 (7th Cir. 2021) (citing *United States v. Jones*, 152 F.3d 680, 687 (7th Cir. 1998)).

Price retorts that his parole agreement "allows *only* parole officers, or authorized Department of Correction employees, to search him without a warrant"—not federal law enforcement.[2] But that is what happened here. State parole officers were the only ones to conduct warrantless searches. Clancy's search of Price's property and residence were supported by probable-cause warrants. Price's parole terms were not violated by federal law enforcement because the authorization of Clancy's search was independent from the parole agreement.

In sum, Price's status as a parolee and the terms of his parole agreement lessened his privacy expectations while bolstering the government's legitimate interests in conducting a search. The terms of Price's parole agreement were not breached—either by parole officers, who had "reasonable cause" to believe Price was in violation of parole, or by Clancy, whose searches were authorized by search warrants independent of the parole agreement. Under *Knights* and *Samson*, the searches of Price's property and residence did not offend the Fourth Amendment.

---

[2] To the extent Price suggests that a breach of a state parole agreement constitutes a violation of the Fourth Amendment, that argument contravenes the Court's holding in *Virginia v. Moore*, 553 U.S. 164, 178 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law."). Properly understood, "[a] parole agreement's terms do not directly shape the contours of Fourth Amendment reasonableness. They merely elucidate the nature of the parolee's privacy expectations." *Wood*, 16 F.4th at 539.

**B**

To avoid this conclusion, Price invites our court to apply the "stalking horse" theory. As our fellow circuit courts have explained, "parole officers may work with police officers provided the parole officers are pursuing parole-related objectives." *United States v. Brown*, 346 F.3d 808, 811 (8th Cir. 2003). But when a parole or probationary search operates as "a subterfuge for a criminal investigation" to evade the Fourth Amendment's warrant and probable cause requirements, such searches "violate[] the Fourth Amendment." *United States v. Stokes*, 292 F.3d 964, 967 (9th Cir. 2002). A parole officer does not act as a stalking horse if, "rather than the police," the officer "intitate[s] the search in the performance of his duties as a parole officer." *United States v. Jarrad*, 754 F.2d 1451, 1454 (9th Cir. 1985); s*ee also United States v. Watts*, 67 F.3d 790, 793–94 (9th Cir. 1995), *cert. granted, judgment rev'd on other grounds*, 519 U.S. 148 (1997) (defining the stalking horse theory). Price argues Clancy used parole officers as pawns to conduct a search by calling them to the scene of the arrest and prompting them to conduct a warrantless search under the parole agreement that Clancy was not himself authorized to conduct. According to Price, this process constituted an unconstitutional circumvention of the Fourth Amendment's warrant requirement.

Although the Supreme Court has never directly addressed the stalking horse theory, the concept appears to stem from the Court's decision in *Griffin*, 483 U.S. 868. *See United States v. Sweeney*, 891 F.3d 232, 236 (6th Cir. 2018) (attributing the origins of the stalking horse theory to *Griffin*). In *Griffin*, the Court considered whether a probation officer's warrantless search of a probationer's home violated the Fourth

Amendment. *Griffin*, 483 U.S. at 870. The Court ruled that it did not because the state's probation system presented "special needs"—facilitating prisoner rehabilitation while simultaneously protecting the community—that required intensive supervision, "mak[ing] the warrant requirement impracticable." *Id.* at 875–76. But in reaching this decision, the Court concluded it was "unnecessary to consider whether … *any* search of a probationer's home by a probation officer is lawful when there are 'reasonable grounds' to believe contraband is present." *Id.* at 880. Following *Griffin*, warrantless probationary searches presumably needed to be grounded in the special needs of a state's probation system as opposed to "law-enforcement officers' using a parole officer as a stalking horse to assist in an unrelated investigation." *Sweeney*, 891 F.3d at 236.

More recently, though, the Court's decisions in *Knights* and *Samson* have eroded this rationale. In *Knights*, the probationer argued that "a warrantless search of a probationer satisfies the Fourth Amendment only if it is just like the search at issue in *Griffin*—*i.e.*, a 'special needs' search conducted by a probation officer monitoring whether the probationer is complying with probation restrictions." *Knights*, 534 U.S. at 117. The Court rejected this argument as "dubious logic." *Id.* Instead, the Court held that the warrantless probationary searches may be justified under "ordinary Fourth Amendment analysis," balancing the probationer's diminished privacy expectations with the government's legitimate interests. *Id.* at 122.

Similarly, in *Samson*, the Court upheld the suspicionless search of a parolee under the Court's "general Fourth Amendment approach," which examined the parolee's privacy

expectations in contrast with the state's "overwhelming inter-est" in supervising parolees. 547 U.S. at 852 n.3, 853. In so rul-ing, the Court said it need not address "whether California's parole search condition is justified as a special need under *Griffin v. Wisconsin* because our holding under general Fourth Amendment principles renders such an examination unnec-essary." *Id.* at 852 n.3 (citation omitted).

*Knights* and *Samson* show that warrantless probation and parole searches need not be based on "special needs," but can also be evaluated under the Fourth Amendment's reasonable-ness inquiry by considering the totality of the circumstances. When the rationale for a search "rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose." *Knights*, 534 U.S. at 122; *see Sweeney*, 891 F.3d at 236 ("Because this justification for the exception is not always related to the special needs of the probationary system, the reason for con-ducting the search need not necessarily be related to those needs either.").

Price does not point to a single federal appellate decision invoking the stalking horse theory after the Court's rulings in *Knights* and *Samson*. Our research yields that each circuit court to have examined the theory since *Knights* has either re-jected it or limited its applicability to circumstances where the government relies on the "special needs" of a state's proba-tionary or parole system as the basis for a search.[3]

---

[3] *United States v. Ickes*, 922 F.3d 708, 712 (6th Cir. 2019) ("[T]he 'stalking horse' caveat, if it survives *Knights* at all, does not apply when a proba-tioner is subject to a valid search provision and law-enforcement officers have a reasonable suspicion that the probationer is engaging in illegal ac-tivity."); *United States v. Williams*, 417 F.3d 373, 377 (3d Cir. 2005)

Whether the stalking horse theory is valid is a question of first impression for this court. Seven years before *Knights*, we signaled approval of the doctrine in *United States v. Coleman*, 22 F.3d 126 (7th Cir. 1994): "[F]ederal law enforcement officers (or the police in general) cannot utilize state probation officials to carry out warrantless searches on their behalf which they as federal agents, acting alone, could not execute without a judicial warrant." *Id.* at 129. But after *Knights*, our court disapproved of the theory in *United States v. Emmett*: "A probation officer (or a parole officer, as the case may be) does not violate his 'client's' rights merely by aiding police." 321 F.3d 669, 672 (7th Cir. 2003). Notably, a stalking horse analysis was not essential to the holdings in either *Coleman* or *Emmett*,[4] and both decisions predated the Court's ruling in *Samson*.

---

("'Stalking horse' claims are necessarily premised on some notion of impermissible purpose, but *Knights* found that such inquiries into the purpose underlying a probationary search are themselves impermissible."); *United States v. Brown*, 346 F.3d 808, 810 (8th Cir. 2003) ("The government counterargues that *United States v. Knights* eliminates the stalking horse theory. We agree with the government." (citation omitted)); *United States v. Tucker*, 305 F.3d 1193, 1200 (10th Cir. 2002) ("[E]ven assuming that the search was a subterfuge for a law enforcement investigation, it was permissible under general Fourth Amendment principles. … As in *Knights*, the officers' motivation is irrelevant."); *United States v. Stokes*, 292 F.3d 964, 967 (9th Cir. 2002) (rejecting the argument that "a probation search that was a subterfuge for a criminal investigation violated the Fourth Amendment" because "[t]he Supreme Court put a stop to this line of reasoning" in *Knights*); *United States v. Reyes*, 283 F.3d 446, 463 (2d Cir. 2002) (referencing the stalking horse theory as "ill-defined" and concluding that "the doctrine is not a valid defense in this Circuit").

[4] Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. REV. 1249, 1282 (2006) ("[B]efore relying on a formulation of law in a prior opinion, we must determine whether it was holding or dictum.

We now hold that when the government relies on the totality-of-the-circumstances analysis as articulated in *Knights* and *Samson* to justify a parole search under the Fourth Amendment, the stalking horse theory has no application. We reserve for another day whether the doctrine has viability for searches that rely solely on the "special needs" of a state's parole system. Because the government does not rely on the "special needs" of Indiana's parole system to justify the searches of Price's property and residence, it is irrelevant whether parole officers initiated their searches of Price's vehicle and residence of their own volition or at Clancy's request.

**III**

Price also challenges the sufficiency of the evidence for his convictions on Count 2 for possessing the .40 caliber pistol and Count 3 for possessing the .223 caliber rifle. "We review de novo a district court's denial of a motion for a judgment of acquittal for insufficient evidence." *United States v. Godinez*, 7 F.4th 628, 638 (7th Cir. 2021). "In doing so, we construe the evidence in the light most favorable to the government, and we affirm a jury's verdict if any rational trier of fact could have found the offense's elements satisfied beyond a reasonable doubt." *Id.* This is a heavy burden, which we have frequently described as "nearly insurmountable." *United States v. Palladinetti*, 16 F.4th 545, 549 (7th Cir. 2021) (quoting *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 405 (7th Cir. 2020)).

To convict a defendant under 18 U.S.C. § 922(g)(1), the government must establish: "(1) the defendant was convicted

---

… If a rule was declared only in dictum, the question remains undecided.").

of a crime punishable by more than one year; (2) the defendant knowingly possessed a firearm; (3) the defendant knew of his felon status; and (4) the gun possessed by the felon had been in or affected interstate commerce." *United States v. Perryman*, 20 F.4th 1127, 1135 (7th Cir. 2021) (citations omitted). Price contests only the second element: whether he possessed the charged firearms.

The government can show either actual or constructive possession. *Id.* Here, Counts 2 and 3 were predicated on a theory of constructive possession. Because Price lived in a shared residence with his girlfriend, the government was required to establish constructive possession with direct or circumstantial evidence by showing Price's proximity to the firearms "coupled with evidence of some other factor—including connection with [an impermissible item], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise." *United States v. Davis*, 896 F.3d 784, 790 (7th Cir. 2018) (alteration in original) (quoting *United States v. Griffin*, 684 F.3d 691, 696 (7th Cir. 2012)).

*Smith & Wesson .40 caliber pistol*. Price argues there was insufficient evidence for a rational trier of fact to find that he constructively possessed the .40 caliber pistol found in the center console of the Ford Escape. He points out that neither his DNA nor his fingerprints were found on the weapon, the Ford Escape was owned by his girlfriend, the government did not present evidence that anyone saw Price with the firearm, and a different friend accompanied Price in the vehicle on the day of the search. Price also contends the pistol was found in the "*closed* center console," and was thus "not easily accessible to Price."

Price's arguments do not persuade us. The firearm was found cocked and loaded in the center console of the Ford Escape which Price drove to Indy Trading Post. This shows Price's proximity to the firearm; whether the console was closed or open did not alter his proximity to the pistol. At the store Price also referred to the gun as "his forty," connecting him to the weapon. In addition, Price purchased .40 caliber ammunition, which was later found in Price's bedroom along with the receipt from the purchase. And although Price maintains he did not own the Ford Escape and that his fingerprints were not found on the weapon, those facts are not dispositive. *United States v. Morris*, 576 F.3d 661, 670 (7th Cir. 2009) ("[T]hat the car was not registered in Morris's name, that other people occasionally had access to the vehicle, and that there were no fingerprints found on the drugs or the gun do nothing to change that conclusion.").

Price disputes his connection to the firearm by arguing that neither his comments regarding "his forty" nor the ammunition purchases show his connection with the specific .40 caliber pistol charged in Count 2. He points to *Griffin*, 684 F.3d 691, for support. There, the defendant was charged with unlawful possession of ten firearms after those guns were discovered in his parents' home where the defendant resided, but the defendant was convicted of possessing only one shotgun and various ammunition. *Id.* at 693–94. On appeal, the defendant contested his conviction. We agreed with him, including because a witness's testimony that two handguns and "some of the shotguns" in the house belonged to the defendant was insufficient to show that the defendant possessed "the specific shotgun … for which he was convicted." *Id.* at 694, 699.

But *Griffin* differs from this case because Price has failed to identify any .40 caliber firearm other than the one in Count 2. Unlike *Griffin*, where several shotguns were found throughout the house, Price's ammunition purchase and his comment regarding "his forty" could relate to only one gun. Without an alternative, the evidence allowed a rational trier of fact to find beyond a reasonable doubt that Price constructively possessed the .40 caliber pistol in Count 2.

*Ruger Mini .223 caliber rifle*. Price raises the same argument for the .223 caliber rifle found in the Oldsmobile van parked in the driveway of the residence he shared with his girlfriend. He emphasizes that testing did not reveal his DNA or his fingerprints on the weapon, the Oldsmobile van was owned by his girlfriend, the government did not present evidence that anyone saw Price with the rifle, and the vehicle was parked at Price's shared residence.

Once again, Price's arguments do not convince us because he cannot refute his proximity to the rifle. That firearm was in the Oldsmobile van parked in the driveway of his residence, and the key to that van was found in the same TV stand that contained the .40 caliber ammunition Price purchased, along with the receipt for that ammunition.

The government also demonstrated Price's connection with the rifle through his attempt to purchase a matching .223 caliber magazine, his follow-up calls to Indy Trading Post about the magazine order, his return there on October 16 to pick up the magazine, and his complaint that the magazine shell he received did not fit "his firearm."

Again, Price invokes *Griffin*, arguing the government's proffered evidence does not show his connection with the

specific .223 caliber rifle in Count 3. But again, unlike in *Griffin*, Price points to no alternative .223 rifle to which his comments might have related. This evidence allowed the jury to find beyond a reasonable doubt that Price constructively possessed the specific .223 caliber rifle in Count 3.

## IV

Price also challenges the applicability of three sentencing enhancements: the multiple-firearms enhancement, the stolen-firearm enhancement, and the obstruction-of-justice enhancement. "We review the district court's application of the Sentencing Guidelines de novo and its factual findings for clear error." *United States v. Law*, 990 F.3d 1058, 1065 (7th Cir. 2021).

*Multiple-firearms enhancement.* Under U.S.S.G. § 2K2.1(b)(1)(A), a two-level enhancement applies if a defendant's felon-in-possession offense involved "three or more firearms." "That total includes not only the specific gun or guns which the defendant was convicted of possessing, but any firearm the possession of which qualifies as relevant conduct." *United States v. Ghiassi*, 729 F.3d 690, 694 (7th Cir. 2013) (citing U.S.S.G. § 1B1.3(a)(2)). Section 1B1.3(a)(2) defines relevant conduct to include acts that are "part of the same course of conduct or common scheme or plan as the offense of conviction." In assessing what offenses constitute the same course of conduct, the Guidelines lists three factors to consider: "[T]he degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3, cmt. n.5(B)(ii).

Here, although Price was charged with possessing the .40 caliber pistol and .223 caliber rifle, the prosecution relied on a

third firearm—the rental gun Price handled briefly while at Indy Trading Post—to secure the multiple-firearms enhancement at sentencing. An examination of each of the three factors shows that the district court did not err in applying this enhancement.

First, the offenses are similar. Price was charged with unlawfully possessing two firearms, and when he handled a rental gun at Indy Trading Post, he possessed that third firearm. *United States v. Matthews*, 520 F.3d 806, 811 (7th Cir. 2008) ("[H]olding a firearm for a brief period of time is sufficient to constitute possession."). Although Price argues he did not intend to personally use this unloaded third gun, these distinctions have no legal significance. A felon's possession of a firearm violates § 922(g)(1) without regard to whether the gun is loaded or if the felon intends to use it. Price's possession of the rental firearm establishes a similar offense because it is proscribed by the same statute underlying Counts 2 and 3.

Second, Price challenges the regularity of his offenses. The Guidelines list "regularity (repetitions) of the offenses" as a factor to consider when assessing whether uncharged conduct constitutes part of the "same course of conduct" as the charged offenses. U.S.S.G. § 1B1.3, cmt. n.5(B)(ii). We have previously defined "regularity" as "repeated acts or events that take place at fixed and certain intervals or in accordance with the same consistent or periodical rule or practice." *United States v. Singleton*, 548 F.3d 589, 592 (7th Cir. 2008) (quoting *United States v. Sykes*, 7 F.3d 1331, 1337 (7th Cir. 1993)). Here, the district court found only three instances of unlawful gun possession. Those three instances are sufficiently numerous to constitute repeated acts. *See United States v. Birk*, 453 F.3d 893, 899–900 (7th Cir. 2006) (determining that one charged firearm

offense and two uncharged firearm offenses was sufficient to apply the multiple-firearms enhancement). Even if the "regularity" factor is not strong here, the other factors underlying this enhancement are present. U.S.S.G. § 1B1.3, cmt. n.5(B)(ii) ("When one of the above factors is absent, a stronger presence of at least one of the other factors is required."); *United States v. Amerson*, 886 F.3d 568, 574 (6th Cir. 2018) ("Without evidence of regularity, the government needed to prove stronger evidence of similarity or temporal proximity.").

Third, Price does not dispute that he possessed the rental firearm at Indy Trading Post while he possessed the .40 caliber pistol in the Ford Escape. This fact is important considering our precedents, under which a defendant's possession of a gun at the "same place" and at the "same time" as other charged firearms supports applying the enhancement. *United States v. Jones*, 635 F.3d 909, 918–19 (7th Cir. 2011) ("'[T]he contemporaneous, or nearly contemporaneous, possession of uncharged firearms is … relevant conduct in the context of a felon-in-possession prosecution' pursuant to § 1B1.3(a)(2)." (quoting *United States v. Santoro*, 159 F.3d 318, 321 (7th Cir. 1998))).

*Stolen-firearm enhancement.* A defendant faces a two-level enhancement for possessing a stolen firearm under U.S.S.G § 2K2.1(b)(4)(A). Price argues this enhancement should not apply because he was not aware that the .40 caliber pistol was stolen.

The Guidelines explicitly state that this enhancement "applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen." U.S.S.G. § 2K2.1(b)(4), cmt. n.8(B). And our decisions have consistently held that this enhancement does not include a scienter requirement. *United*

*States v. Statham*, 581 F.3d 548, 553 (7th Cir. 2009); *United States v. Schnell*, 982 F.2d 216, 219–22 (7th Cir. 1992).

Price responds that *Rehaif v. United States*, 139 S. Ct. 2191 (2019), requires the government to show that he knew the firearm was stolen before seeking this enhancement. In *Rehaif*, the Court held that "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Id.* at 2200. The Court reached this conclusion by invoking "the presumption in favor of scienter," which "applies with equal or greater force when Congress includes a general scienter provision in the statute itself." *Id.* at 2195. Of special importance was "[t]he text of § 924(a)(2)," which stated "that '[w]hoever knowingly violates' certain subsections of § 922, including § 922(g), 'shall be' subject to penalties of up to 10 years' imprisonment." *Id.* (quoting 18 U.S.C. § 924(a)(2)). "[B]y specifying that a defendant may be convicted only if he 'knowingly violates' § 922(g), Congress intended to require the Government to establish that the defendant knew he violated the material elements of § 922(g)." *Id.* at 2196.

Price does not invoke *Rehaif* to appeal his convictions under 18 U.S.C. § 922(g). Instead, he attempts to extend *Rehaif*'s scienter requirement to this sentencing enhancement. But *Rehaif* never addressed sentencing enhancements, and the most recent Guidelines Manual makes no reference to that decision. U.S. SENT'G GUIDELINES MANUAL (U.S. Sent'g Comm'n 2021). Price has not cited, and our research has not revealed, a published decision by another circuit court suggesting *Rehaif* applies to sentencing enhancements. In fact, the opposite is true.

*United States v. Palos*, 978 F.3d 373, 377–78 (6th Cir. 2020). Further, the rationale of *Rehaif* does not support Price's position. *Rehaif* emphasized the importance of the word "knowing" in the statute to infer Congress's intent to impose a *mens rea* requirement. But this enhancement applies "regardless of whether the defendant knew or had reason to believe that the firearm was stolen." U.S.S.G. § 2K2.1(b)(4), cmt. n.8(B). We therefore decline to extend *Rehaif* beyond its holding to the stolen-firearm enhancement of U.S.S.G § 2K2.1(b)(4)(A).

*Obstruction-of-justice enhancement*. Defendants are subject to a two-level enhancement if they "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. When the enhancement is based on perjury, "the district court should make a finding as to all of the factual predicates necessary for a finding of perjury: false testimony, materiality, and willful intent." *United States v. Johnson*, 612 F.3d 889, 893 (7th Cir. 2010). While separate findings on each element are preferred, they are not always strictly necessary. *Id.*

The district court determined at sentencing that Price had committed perjury when he testified at trial that he did not know how to load a firearm, how to identify if a firearm was loaded, or how a magazine worked, and that he had never shot nor held a firearm prior to October 17, 2018. While Price testified at the sentencing hearing that the government's line of questioning had confused him, the court did not believe his explanation and imposed this sentencing enhancement.

Price argues the district court erred because it did not make a specific finding that his testimony at trial on this topic

was material.[5] *Johnson* clarifies that such specific findings are not strictly necessary. 612 F.3d at 893. But even if the court erred, any error was harmless. As we have previously held, "[a] material statement is one that 'if believed, would tend to influence or affect the issue under determination.'" *Id.* at 895 (quoting U.S.S.G. § 3C1.1, cmt. n.6). Price's false testimony was directly relevant to the possession element of the underlying charges and tended to contradict evidence showing he possessed the relevant firearms, such as his statements to store employees that the magazine shell did not fit "his firearm." Price's false testimony, if believed, goes to the issue of whether he possessed the .40 caliber pistol and .223 caliber rifle—a material issue for Counts 2 and 3.

Finally, Price maintains that the district court erred by not explicitly finding that his false statements were willful. But as we stated in *Johnson*, "separate findings are not strictly necessary so long as the court determined that the defendant lied to the judge and jury about matters crucial to the question of the defendant's guilt." *Id.* at 893 (quoting *United States v. White*, 240 F.3d 656, 662 (7th Cir. 2001)). Those requirements were satisfied when Price testified at sentencing that he had not lied but was confused by the government's line of questioning. The district judge responded by declaring that "the Court believes that that testimony [is] false." Because the court found that Price lied, and the issue is material to Count

---

[5] The Government argues Price failed to object below so "plain error review applies" to this argument. We disagree. Price objected to this enhancement at sentencing, and the district court did not specifically elicit objections to the adequacy of its findings, so plain error does not apply. *United States v. Freitag*, 230 F.3d 1019, 1025 n.7 (7th Cir. 2000) (citing *United States v. Patel*, 131 F.3d 1195, 1201–02 (7th Cir. 1997)).

3, the court did not err by applying the obstruction-of-justice enhancement at sentencing.

*      *      *

For these reasons, we AFFIRM the judgment of the district court.