Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 10, 2003　　　Decided February 13, 2004

No. 02-3062

UNITED STATES OF AMERICA,
APPELLEE

v.

JAMES ISAAC GASTON,
APPELLANT

Consolidated with
No. 02–3063

Appeals from the United States District Court
for the District of Columbia
(01cr00259)
(01cr00259–01)

*Neil H. Jaffee*, Assistant Federal Public Defender, argued
the cause for appellant James Isaac Gaston. *Paul H. Zuker-*

---

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

*berg* argued the cause for appellant Jacqueline V. Shelton. With them on the briefs was *A. J. Kramer*, Federal Public Defender.

*Lisa H. Schertler*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *John R. Fisher* and *Thomas J. Tourish, Jr.*, Assistant U.S. Attorneys.

Before: RANDOLPH and ROGERS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* ROGERS.

RANDOLPH, *Circuit Judge*: James I. Gaston and Jacqueline V. Shelton appeal their convictions for possessing heroin with intent to distribute it, and for possessing a firearm during a drug trafficking offense. Gaston also appeals his conviction for unlawful possession of a firearm by a felon. The issues deal with the legality of the search of Gaston's residence, with the admission into evidence of statements he made during the search, with the sufficiency of the evidence, and with Shelton's motion to disclose the identity of a confidential informant.

## I.

An agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), in his affidavit supporting a search warrant, stated that a confidential informant – "CI–1" – contacted the agent "[w]ithin the last 72 hours," gave the address of a house in which "Jimmy" resided, and reported observing a handgun there. The affidavit further stated that CI–1 had provided reliable information to ATF in the past, leading to the execution of four search warrants and the recovery of firearms, narcotics and money; that CI–1 had never provided inaccurate information; and that in the agent's experience, those who illegally possess firearms do not regularly dispose of them. The affidavit reported that ATF's investigation, using the computer-based Washington Area Law Enforcement Sys-

tem, indicated that "Jimmy" was James Isaac Gaston, an individual who "ha[d] been arrested numerous times in the past for weapon and drug violations," and had "felony convictions" for carrying a "pistol without a license in 1982, 1987 and 1990."

A judge of the Superior Court of the District of Columbia issued a search warrant on June 19, 2001, finding probable cause to believe that there was a firearm in the two-story row house Gaston occupied. Later in the day, officers of ATF and the United States Park Police executed the warrant, seizing among other things two pistols, heroin, a scale and cash.

Gaston and Shelton claim the search violated their Fourth Amendment right against unreasonable searches and seizures because the affidavit did not support the judge's finding of probable cause. They identify several defects in the affidavit: the affidavit did not say when CI–1 saw the handgun; it did not explain why CI–1 was in the house, or where in the house CI–1 saw the weapon; and it did not indicate that the agents had corroborated CI–1's information before seeking the warrant. Also, the statement that Gaston had felony convictions in 1982, 1987 and 1990 for unlawfully possessing firearms turned out to be incorrect; the presentence report stated that he had only one such conviction, in 1984.

In none of the pretrial proceedings did Gaston alert the district court to the affidavit's mistake about the number of his felony convictions for firearms offenses, something one would expect Gaston to know. His attorney merely said to the court, first, that he "had joined" Shelton's pretrial motion to suppress, which the court earlier had denied without a hearing, and second: "we would also challenge the evidence seized from the home on the basis of a Franks violation contained in the warrant. I think there are some factual inaccuracies in the warrant." The court responded that counsel had not triggered a "Franks hearing."

The district court was surely right. Under *Franks v. Delaware*, 438 U.S. 154, 171 (1978), a defendant is entitled to an evidentiary hearing only if his attack on the accuracy of

the affidavit is "more than conclusory" and is accompanied by "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Gaston made no offer of proof. He did not allege deliberate falsehood or reckless disregard of the truth. He directed his claim of "inaccuracies" at the "warrant," rather than the affidavit. And even if he had the affidavit in mind, he identified no particular inaccuracy, let alone a deliberate or reckless one. Shelton's motion to suppress filled in none of these gaps. Her motion merely asserted, in general terms, that the warrant was not supported by probable cause "with respect to Ms. Shelton."

Given this record, the government urges us to review the district court's refusal to suppress the evidence for plain error only. At oral argument, Gaston conceded that plain error was the proper standard. In the normal course, we would sustain the district court's findings of fact unless they were clearly erroneous and would examine its legal conclusions *de novo*. *See United States v. Pindell*, 336 F.3d 1049, 1052 (D.C. Cir. 2003). In this case, it hardly matters which of these standards of review we employ. There is no possible way for these defendants to overcome *United States v. Leon*, 468 U.S. 897 (1984). The Supreme Court there assumed that the affidavit in support of the warrant did not supply probable cause because it relied on a confidential informant of unproven credibility; because some of his information was stale; and because the police had not corroborated other information the informant provided. But *Leon* held that if the officers had gathered evidence in objectively reasonable reliance on the search warrant, the evidence should not be suppressed despite the affidavit's inadequacy. *Id.* at 922–24. Here the defendants offered no reason to believe that the ATF agent, in preparing his affidavit, knew that what he wrote about Gaston's felony convictions was false, or that he acted in reckless disregard of the truth. *Id.* at 926. Neither defendant formally moved for an evidentiary hearing under *Franks*, or even attempted to make the sort of showing that would have entitled them to one. We also doubt that it mattered much whether Gaston had "only" one prior convic-

tion, rather than three. But even if it did matter, there is no evidence to support attributing the error to the deliberate or reckless action of the officers involved in the search. The affidavit indicated that the information about Gaston's convictions came not from the officers, but from information in a computer system. The defendants' arguments rest on unsupported factual inferences, unsupported because they never made their evidentiary case in the district court.

There is nothing to the defendants' further point that *Leon's* good-faith exception is inapplicable because the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975)). The ATF agent's affidavit was as strong as the affidavit in *Leon*, and in important respects stronger. The ATF agent at least established the informant's reliability. And fairly read, his affidavit indicated that the informant's information was fresh. The affidavit said CI–1 had contacted the agent within the last "72 hours" about observing a handgun in "Jimmy's" residence. It is a fair reading, though not the only one, that the report and the observation occurred within the last three days. *See United States v. Ventresca*, 380 U.S. 102, 108 (1965). Besides, the affidavit stated that in the agent's experience, individuals who come into possession of firearms tend to keep possession of them. If "Jimmy" had a gun in his house three days before the search, or three weeks before the search, that information would support probable cause. On the other hand, in *Leon* the informant's first-hand knowledge concerned drugs sold out of home five months before the search, which is why the court of appeals treated the information as stale. 468 U.S. at 904.

We therefore hold that under *Leon*, defendants were not entitled to suppression of the evidence seized in the search of Gaston's residence.

## II.

Gaston claims the district court should have suppressed statements he made to an officer during the search.

Ten to fifteen officers entered the row house. They found three adults and three children. The three children were Gaston's and Shelton's. Gaston and Shelton were in the doorway of the second floor master bedroom. The officers handcuffed them and moved them to the first floor living room. There Officer David Hurley interviewed Gaston, who remained handcuffed. At the time, the search of the premises had not begun. Officer Hurley asked Gaston for his name, address, date of birth, and social security number. Gaston gave his present location as his address. Officer Hurley also asked Gaston if he owned the house, to which Gaston replied that he co-owned the house with his sisters, who lived elsewhere. The government introduced Gaston's statements at trial.

Before questioning Gaston about his address and ownership of the house, no officer gave him the warnings set forth in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The government defends the omission on several grounds, one of which is that *Miranda* did not apply because Gaston was not in custody. The "ultimate inquiry," the Court said in *California v. Beheler*, 463 U.S. 1121, 1125 (1983), "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." "Custody" is determined objectively: would a reasonable person have understood his situation to be comparable to a formal arrest? *Berkemer v. McCarty*, 468 U.S. 420, 441–42 (1984). Gaston was handcuffed when Officer Hurley questioned him although the officers had not yet formally arrested him. The government argues that handcuffing does not automatically constitute custody, but is merely one factor to be considered. There is authority to this effect, *see, e.g., United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995), *United States v. Bautista*, 684 F.2d 1286, 1291–92 (9th Cir. 1982), but we do not have to decide whether to follow it because the questioning fell within an exception to *Miranda*.

The Supreme Court held in *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990), that officers asking routine booking questions "reasonably related to the police's administrative concerns" are not engaged in interrogation within *Miranda*'s

meaning and therefore do not have to give *Miranda* warnings. Gaston's address and ownership interest in the house also related to "administrative concerns." 496 U.S. at 601–02. The questions dealt as much with record-keeping as the similar booking questions asked in *Muniz*. Under FED. R. CRIM. P. 41(f)(3)(A), the "officer executing the warrant must . . . give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken . . . ." In order to comply with Rule 41, the officers sought to find out who owned the house. While public records would show this, we believe *Muniz* allowed the officers to ask routine questions about the subject without having to advise Gaston of his right to counsel and his privilege against self-incrimination. We do not agree with the concurring opinion that the officers should have performed an analysis, based on the law of real property, of the difference between residency and ownership in order to determine – in the words of Rule 41 – "whose premises" they were searching. At any rate, the incriminating fact was that Gaston resided in the house and, on that subject, the government introduced ample other evidence, some of which is summarized below, thus rendering any error in receiving Gaston's statement harmless.

## III.

Gaston and Shelton assert that their convictions under 18 U.S.C. § 924(c) for possessing a firearm in furtherance of a drug trafficking offense are not supported by the evidence. Section 924(c)(1)(A) imposes a mandatory five-year sentence for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A).

When the officers entered the house they found Gaston and Shelton standing in the doorway of the master bedroom on the second floor. In the bedroom, the officers recovered a clear ziplock bag from the floor between the bed and the wall;

the bag contained forty smaller ziplock bags of heroin. They also found two firearms: a loaded semiautomatic pistol between the box spring and the mattress of the bed, and a loaded .38 caliber revolver in a pillowcase on the floor in front of the bed. The pillowcase also contained $9,650 in cash. Elsewhere in the bedroom officers collected items linking Gaston and Shelton to the residence, including a dry-cleaning ticket in Gaston's name attached to a shirt hanging beside a closet; in a purse on the floor, Shelton's driver's license identifying the search address as her residence; bills for utilities addressed to Gaston at the search address; and a copy of Shelton's income tax return for 2000 listing the same address as her place of residence. In the kitchen officers recovered a scale and two more ziplock bags of heroin. The government presented all of this evidence to the jury.

The facts of this case are similar to those in *United States v. Wahl*, 290 F.3d 370 (D.C. Cir. 2002). Officers executing a search warrant at a residence found the defendant standing in front of an entertainment center on top of which was a firearm. Drugs were recovered from the VCR's videotape slot and from the pockets of another person in the residence. *Id.* at 373. In affirming the defendant's § 924(c) conviction, we held that the jury could find that the defendant had constructive possession of the firearm. Officers found the firearm in close proximity to him, and "a jury is entitled to infer that a person exercises constructive possession over items found in his home." *Id.* at 376; *see also United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C. Cir. 1991) ("The natural inference is that those who live in a house know what is going on inside . . . ."). The "in furtherance of" language of § 924(c) means that "the weapon must promote or facilitate the crime." *See Wahl*, 290 F.3d at 376 (citing *United States v. Mackey*, 265 F.3d 457, 460–61 (6th Cir. 2001)). This requirement can be satisfied by "a showing of some nexus between the firearm and the drug selling operation." *Mackey*, 265 F.3d at 462. In *Wahl*, we considered the factors the Sixth Circuit cited in *Mackey*: "whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under

which the firearm was found." *Wahl*, 290 F.3d at 376 (citing *Mackey*, 265 F.3d at 462, and *United States v. Ceballos–Torres*, 218 F.3d 409, 414–15 (5th Cir. 2000)). "The list of factors is not exclusive, but it helps to distinguish possession in furtherance of a crime from innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard." *Mackey*, 265 F.3d at 462.

The firearm in *Wahl* was loaded and "in close proximity" to cocaine and a small amount of cash, and the defendant possessed the gun illegally. *Wahl*, 290 F.3d at 376. So here. Both pistols were illegally possessed; both were loaded; both were in the bedroom Gaston and Shelton occupied; and both pistols were close to drugs, and – so the jury could have found – drug proceeds. Here, as in *Wahl*, the pistols were "strategically located so that [they were] quickly and easily available for use" in furtherance of the drug crimes. *Wahl*, 290 F.3d at 376 (quotations omitted). We therefore uphold the defendants' § 924(c) convictions.

## IV.

Shelton challenges the district court's denial of her motion for disclosure of the identity of the confidential informant mentioned in the search warrant affidavit.

*Roviaro v. United States*, 353 U.S. 53, 59 (1957), approved – in the exercise of the Court's supervisory power – an "informer's privilege" protecting the identity of individuals who provide the government with information about crimes. "The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* However, "fundamental requirements of fairness," *id.* at 60, limit use of the privilege at trial. *McCray v. Illinois*, 386 U.S. 300, 309 (1967). When "the disclosure of an informer's identity . . . is relevant or helpful to the defense of an accused . . . the privilege must give way." *Roviaro*, 353 U.S. at 60–61.

One must be careful not to read too much into this last statement from *Roviaro*. In speaking of evidence "relevant

or helpful to the defense" the Court could hardly have meant that the privilege covers only irrelevant and unhelpful evidence. The Court supported its statement with a footnote citing, among other cases, *Scher v. United States*, 305 U.S. 251 (1938), from which it quoted the following: "public policy forbids disclosure of an informer's identity unless essential to the defense. . . ." 353 U.S. at 61 n.9 (citing *Scher*, 305 U.S. at 254). The Court also described three appellate decisions as holding that an informant's identity "must be disclosed whenever the informer's testimony may be relevant and helpful to the accused's defense." 353 U.S. at 61–62. Again the Court dropped a footnote and again it described one of the appellate cases as holding disclosure must be ordered when it "was essential to the defense." *Id.* at 62 n.12. And in concluding its general discussion of the privilege, the Court stated that "no fixed rule with respect to disclosure is justifiable." *Id.* at 62.

In *Rugendorf v. United States*, 376 U.S. 528 (1964), a stolen property prosecution after *Roviaro*, the Court refused to order disclosure of the identity of an informant who allegedly saw the stolen property in the defendant's basement. *Id.* at 534–35. The Court distinguished *Roviaro* "where the informant had played a direct and prominent part, as the sole participant with the accused, in the very offense for which the latter was convicted." *Id.* at 534. By contrast, in *Rugendorf* the Court could not "say on this record that the name of the informant was necessary to his defense." *Id.* at 534–35.

In light of *Rovario* and *Rugendorf*, we have required, as a prerequisite to disclosure, that the informant have had some sort of direct connection, either as a participant or an eyewitness, to the crime charged. The issue in *United States v. Skeens*, 449 F.2d 1066 (D.C. Cir. 1971), was whether a defendant charged with armed robbery had the right to learn the identity of an informant who three weeks after the crime provided officers with, *inter alia*, information about the whereabouts of the shotgun involved and details of the robbery. *Skeens* refused to require disclosure because "[u]nlike *Roviaro*, nothing in this record establishes that the informant was a participant, an eyewitness, or a person who was other-

wise in a position to give direct testimony concerning the crime . . . [A]ll the evidence discloses is that the informer was an informer and nothing more." *Id.* at 1070 (quotations omitted). The defendant has a "heavy burden . . . to establish that identity of an informant is necessary to his defense." 449 F.2d at 1071 (citing *Rugendorf*, 376 U.S. at 535). With respect to search warrants we have not required the government to disclose the identity of an informant who saw the fruits of the search prior to execution of the warrant but who had no involvement in the charged crime. In *United States v. Warren*, 42 F.3d 647 (D.C. Cir. 1994), the informant advised police that within the past seven days crack cocaine had been stored and sold at a specified residence. The informant also participated in a controlled drug buy. The police recited this information in an affidavit submitted to a magistrate, who then issued a search warrant. 42 F.3d at 652. When the search of the residence uncovered drugs and a firearm, Warren was charged with (and later convicted of) possession of crack cocaine with intent to distribute and use of a firearm during and in relation to a drug offense. *Id.* at 652. While we recognized that the informant's testimony "might have been helpful to Warren," particularly since the informant was the sole witness besides Warren to the controlled drug buy, we did not require disclosure. Warren had not been charged with an offense arising from the drug transaction with the informant. He was convicted only of crimes arising from the search and the informant was not a participant in, or eyewitness to, those crimes. *Id.* at 654. The "informant's role was limited to providing the information that justified issuance of the search warrant." *Id.*

In the district court Shelton argued that because the government relied on the informant to obtain the search warrant, it was "essential" for her "to investigate whether the government's reliance on such sources was reasonable." The district court quite clearly did not abuse its discretion – the standard of review (*see Warren*, 42 F.3d at 654) – in denying Shelton's disclosure motion. The case is indistinguishable from *Warren*. As here, the offenses charged in *Warren* were possession of illegal drugs and use of a firearm in relation to

the drug offense. As here, the informant provided information leading to a search warrant. The offenses charged in the *Warren* indictment and the indictments of Gaston and Shelton occurred not when the informant made his observations, but at the time of the search, when the illicit items were discovered. We therefore held in *Warren* and hold in this case that because the informant neither participated in nor witnessed the offenses, the district court properly denied the disclosure motion. *Id.*

Shelton has a rather a different argument on appeal regarding why the district court should have ordered the government to identify the informant. Now the claim is that the informant's testimony could exculpate her if the informant linked only Gaston, or someone else, to the firearms and drugs found during the search. If the warrant affidavit is to be believed, she claims, the informant would have testified that Gaston was in either actual or constructive possession of the firearms. The district court did not commit plain error in failing to anticipate this argument and in declining to order the government to reveal the informant's identity. It was incumbent upon Shelton to shoulder the "heavy burden" of showing why the informant's testimony was "necessary" to her defense at trial. *Skeens*, 449 F.2d at 1070. She did nothing of the sort. Her motion did not even describe the nature of her defense; still less did it mention how she expected the informant to advance her cause.

We have considered and rejected the defendant's remaining contentions.

For the foregoing reasons, the judgments of conviction are affirmed.

*So ordered.*

ROGERS, *Circuit Judge*, concurring in part and concurring in the judgment: It is well established that law enforcement officers must give *Miranda* warnings when questioning is initiated once " 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Beckwith v. United States*, 425 U.S. 341, 347 (1976) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The court does not decide whether Gaston was in custody when he was questioned by the police while in handcuffs prior to being informed of his *Miranda* rights. It holds that the questions Gaston was asked fall within the exception to *Miranda* recognized by the Supreme Court in *Pennsylvania v. Muniz*, 496 U.S. 582, 600–02 (1990), for routine booking questions. *See* Op. at 6–7. I write separately to clarify two points regarding Gaston's Fifth Amendment claim: first, whether Gaston was in custody when he was questioned by the police while in handcuffs; and second, whether Gaston's Fifth Amendment rights were violated when the police asked him whether he resided in or owned the searched premises before advising him of his *Miranda* rights.

First, the cases relied on by the court to the effect that in determining whether a defendant is in custody the fact that he is in handcuffs is only one factor are not dispositive here. *See* Op. at 6 (*citing United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995); *United States v. Bautista*, 684 F.2d 1286, 1291–92 (9th Cir. 1982)); *see also United States v. Fountain*, 2 F.3d 656, 666 (6th Cir. 1993). Although, under this line of authority, the police acted reasonably in handcuffing all adults in the premises as a protective measure when executing the search warrant for a firearm, by the time the police officer questioned Gaston, without *Miranda* warnings, the initial justification for handcuffing him that is recognized in these cases, namely the officers' safety, no longer existed. By this time, the police had located all persons who were in the premises and brought them to a central location in the premises, with at least three or four police officers (not including the officer who questioned Gaston) standing guard. There was no evidence to suggest that the police had any concern that these persons were armed, would be uncoopera-

tive, destroy evidence, or escape. *Cf. Bautista*, 684 F.2d at 1289–90. Under the circumstances, as "there was nothing to suggest that any of the officers were any longer concerned with their own physical safety," Gaston was "in police custody." *New York v. Quarles*, 467 U.S. 649, 655 (1984). Unlike in the only case cited by the government in which a statement was taken at the premises from a defendant in handcuffs at the time of the execution of a search warrant, *United States v. Newton*, 181 F. Supp. 2d 157, 160, 174 (E.D.N.Y. 2002), Gaston was not informed that he was not under arrest or that the handcuffs were for his and the officers' safety.

Second, the routine booking exception under *Muniz* applies only to questions that are necessary to assist the police in carrying out administrative functions. *Muniz*, 496 U.S. at 592–600, 602 n.14. In *Muniz*, the Supreme Court distinguished between routine booking questions "to secure the biographical data necessary to complete booking or pretrial services," *id.* at 601 (citations omitted), and the type of question that, while related, goes beyond what is necessary for booking purposes. While the exception extends to questions "reasonably related to the police's administrative concerns," *id.* at 601–02, the Court instructed that "the police may not ask questions, even during booking, that are designed to elicit incriminating admissions." *Id.* at 602 n.14 (citations omitted). The police not only had asked Muniz, who was suspected of driving while intoxicated, questions about his name, address, height, weight, eye color, date of birth, and current age, but also asked whether he knew the date of his sixth birthday. *Id.* at 585–86. The Court held that the sixth birthday question was "testimonial in nature," *id.* at 594, causing the defendant to "reveal, directly or indirectly, his knowledge of facts relating him to the offense," *id.* at 595, and because that question was unnecessary for administrative purposes, it did not fall within the routine booking exception. *Id.* at 592–602.

The court holds that the questions Gaston was asked by the police fall within the routine booking exception under *Muniz*. *See* Op. at 6–7. As *Muniz* makes clear, whether a question falls within the exception depends on the particular circum-

stances. 496 U.S. at 602. When the police officer asked Gaston whether he resided in and whether he owned the premises being searched, the questions were potentially incriminating given the object of the search warrant, namely a firearm and any related paraphernalia at the premises. *See United States v. Disla*, 805 F.2d 1340, 1346–47 (9th Cir. 1986); *see also Muniz*, 496 U.S. at 602; *United States v. Doe*, 878 F.2d 1546, 1551–52 (1st Cir. 1989); *United States v. Mata–Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983); *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112–13 (2nd Cir. 1975). The court therefore must scrutinize the administrative need for the questions, applying an objective standard, particularly where, as here, the questioning did not occur at a police station. *See Doe*, 878 F.2d at 1551.

In support of its holding that the questions were related to administrative concerns, the court cites FED. R. CRIM. P. 41(f)(3)(A), which requires that "[t]he officer executing the warrant must . . . give a copy of the warrant and a receipt for the property taken to the person from whom, *or* from whose premises, the property was taken." (emphasis added). *See* Op. at. 7. On its face, the Rule would appear to indicate that there was a "legitimate administrative need," *Doe*, 878 F.2d at 1551, to ask Gaston both whether he resided in and whether he owned the premises. However, once Gaston told the officer that he resided at the searched premises, the Rule simply required the notice of any property taken from his residence to be given to him or another occupant present at the time. It was unnecessary to determine if Gaston also owned the premises. The language of the Rule does not require the notice to be given to the property owner whenever the seized property is not taken from the immediate possession of the defendant or another occupant of the premises. Further, the ownership question was potentially incriminating. Although Gaston's residence at the premises may suffice to establish his constructive possession of the seized items, to the extent it did not, then evidence of his ownership of the property would fill the evidentiary gap. *See United States v. Heckard*, 238 F.3d 1222, 1228–29 (10th Cir. 2001); *see also United Mergerson*, 4 F.3d 337, 348–49 (5th Cir. 1993);

*United States v. Foster*, 783 F.2d 1087, 1089–90 (D.C. Cir. 1986); *United States v. Whitfield*, 629 F.2d 136, 142–43 (D.C. Cir. 1980). Contrary to the suggestion of the court, the police did not need to perform "an analysis, based on the law of real property, of the difference between residency and ownership." Op. at 7. Instead, consistent with the limited exception to the *Miranda* requirement that *Muniz* recognizes, the police had to limit their questioning to the information that was necessary for their legitimate administrative purposes. To the extent the Rule is the underpinning of the court's conclusion that all of the questions the police asked Gaston were within the *Muniz* exception, the Rule does not support the conclusion.

It is unnecessary, however, to resolve whether the ownership question falls within *Muniz*'s limited exception to the *Miranda* requirement. Even if Gaston was in custody when he was asked if he owned the premises and the question was unnecessary and potentially incriminating, and thus did not fall within *Muniz*'s routine booking exception, any error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967). At trial, the government used the evidence of Gaston's ownership of the premises to show only that he resided at or possessed the premises as a means of linking Gaston to the seized contraband. There was ample other evidence that Gaston resided at the premises, including his clothes and receipts, and bills and other mail in his name. *See* Op. at 8. Under the circumstances, the court can confidently conclude that admission into evidence of Gaston's statement concerning ownership, even if violative of his Fifth Amendment rights, had no effect on the jury's verdict. *Id.*