In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 23-2910 and 24-1174

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEANDRE MAXWELL and TYRONE FULWILEY,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Central District of Illinois.
No. 21-CR-20061 — **Colin S. Bruce**, *Judge.*

_____

ARGUED APRIL 1, 2025 — DECIDED JULY 16, 2025

_____

Before SYKES, *Chief Judge*, and SCUDDER and KIRSCH, *Circuit Judges*.

KIRSCH, *Circuit Judge*. After a warrant-backed search of their apartment revealed firearms, cocaine, and other paraphernalia associated with drug distribution, Tyrone Fulwiley and Deandre Maxwell were charged with possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1) & (b)(1)(B), possession of a firearm in furtherance of a drug trafficking offense, 18 U.S.C. § 924(c)(1)(A), and possession of a

firearm by a felon, 18 U.S.C. § 922(g)(1). Maxwell pleaded guilty to the charges, and Fulwiley proceeded to trial, where he was convicted on all counts by a jury.

In this consolidated appeal, Maxwell and Fulwiley challenge the search on several fronts. They argue that the district court erred in denying their motion to suppress evidence from the search, their motion for a *Franks* hearing on the veracity of the warrant affidavit, and their motion to reveal the identity of the confidential informant whose tip formed the basis for the search warrant. Individually, Fulwiley also challenges the sufficiency of the evidence to support his conviction. We affirm on all issues.

## I

### A

On September 27, 2021, Detective Lance Carpenter of the Champaign Police Department requested a warrant to search an apartment and seize items related to drug distribution. To establish probable cause, he included the following facts in a warrant affidavit.

About a week earlier, Champaign County Crime Stoppers received an anonymous tip about the occupants of Apartment 209 at Park Place Apartments:

> The tenants in this apartment [are] most likely dealing drugs. They have people in and out every 5 to 10 minutes. Anywhere from 5 to 10 times a day. Quick pick ups and drop offs. Witnessed money exchanging hands quickly. Witnessed guns in waist bands. Everybody in this complex knows what they're doing.

Believing that the behavior described in the tip was consistent with illegal drug sales, Detective Carpenter began to investigate further. He contacted the property manager of Park Place Apartments, who confirmed that she had received complaints from multiple tenants about suspected drug sales out of Apartment 209. She further advised Detective Carpenter that, based on reports from maintenance employees, the apartment was currently being occupied by two Black men and not by Lori Wilson, the named tenant on the lease.

A search of local police records revealed that cocaine and cannabis were found in a car owned by Wilson during a traffic stop in Rantoul, Illinois. The occupants of the car (who did not match the description of the men occupying Apartment 209) claimed the drugs belonged to someone else. Detective Carpenter then spoke with Detective James Barnett, a narcotics investigator for the Rantoul Police Department, who relayed an anonymous tip that two Black men going by the aliases "Sox/Socks" and "Benjamin Franklin" were drug dealers associated with the drugs found in Wilson's vehicle.

Next, Detective Carpenter made contact with a confidential informant who lived near Apartment 209, referred to in the affidavit by the pseudonym "Maddison Kirk." In the affidavit, Detective Carpenter explained that he considered Kirk a reliable source of information: to his knowledge, she had no prior criminal convictions nor association with the subjects of the investigation, and she provided information without expectation of a reward. Kirk told him that two Black men in their early thirties were the sole occupants of Apartment 209. Multiple times per week (and often multiple times per day), Kirk observed both men meeting with various people and conducting hand-to-hand exchanges, with visitors sometimes

briefly entering the apartment. Kirk had also smelled mariju-ana emanating from the apartment and, on one occasion, had seen one of the occupants with a black handgun tucked into his waistband. After conducting a Facebook search, Kirk iden-tified Facebook profiles for "Sox Chasin" and "Ben Frankline" with photos that matched the occupants of Apartment 209.

Detective Carpenter matched the biographical infor-mation and photos on these Facebook profiles to police rec-ords and booking photos of Tyrone Fulwiley and Deandre Maxwell. A criminal record search revealed that they had pre-viously been convicted as codefendants in a federal cocaine conspiracy case. Detective Carpenter showed photos of Max-well and Fulwiley to Kirk, who confirmed that they were the two men occupying Apartment 209. Both Detective Carpenter and Kirk appeared in person before the issuing judge and swore that the information in the warrant affidavit was true and correct to the best of their knowledge. The judge issued the search warrant the same day.

B

Two days later, law enforcement executed a search of Apartment 209. Maxwell was home during the search, but Fulwiley was not present. Officers uncovered substantial evi-dence of drug trafficking inside the two-bedroom unit. In the shared kitchen, agents found over 418 grams of cocaine bagged for sale along with multiple digital scales and several bottles of inositol powder (a common cutting agent for co-caine). In the living room, agents found a loaded 9mm pistol hidden under an ottoman cushion and two baggies of cocaine in a sweatshirt lying on a chair.

Maxwell's personal belongings—including multiple IDs, credit cards, and dry-cleaning receipts bearing his name—were found in the north bedroom of the apartment. In this bedroom, agents found another loaded 9mm pistol, a stack of cash, and two baggies containing 27.7 grams of cocaine. Fulwiley's personal effects—including credit/debit cards and a money order in his name—were located in the south master suite. Agents found multiple baggies of cocaine in the master bedroom and 128.1 grams of cocaine in the vanity of the adjoining bathroom. In total, law enforcement found over 629 grams of cocaine in the apartment.

Both Maxwell and Fulwiley were indicted for possession of 500 grams or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A), and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Both defendants moved to suppress the evidence seized during the search, arguing that the warrant was not supported by probable cause. They also requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to evaluate the veracity of the warrant affidavit and moved to reveal Kirk's identity. The district court conducted a pre-*Franks* hearing but ultimately denied each of these motions.

Maxwell pleaded guilty to the charges, but Fulwiley proceeded to trial. At trial, law enforcement agents testified about the cocaine they found throughout the apartment and discussed how items like digital scales and inositol powder are used in drug distribution operations. The government's expert in drug trafficking testified that the drugs recovered were distribution quantities and identified the two firearms in the

apartment as "ghost guns" (i.e., untraceable firearms lacking serial numbers). He explained to the jury that drug dealers commonly use handguns for protection and that ghost guns are favored because it is harder for law enforcement to determine whether they are stolen or have been used in previous crimes. A forensic expert for the government further testified that Fulwiley's DNA was present on the grips of both guns.

To establish that Fulwiley lived in Apartment 209, the government introduced photographs of his personal effects recovered from the south master suite. Lori Wilson testified that she sublet the unit to Fulwiley and that he had been paying her cash rent up through the time of the search. The jury also heard testimony from Daniel Walls, a neighbor who lived in the building. Walls identified Fulwiley in court as one of the two men living in Apartment 209 and testified that the apartment had frequent visitors—more than any other unit in the building. The jury ultimately convicted Fulwiley on all counts. Fulwiley moved for a judgment of acquittal, arguing the evidence was insufficient to support his conviction, but the district court denied his motion.

## II

In this consolidated appeal, Fulwiley and Maxwell argue that the district court erred in denying their motion to suppress evidence from the search, their motion for a *Franks* hearing, and their motion to reveal the identity of the confidential informant. Fulwiley also individually challenges the sufficiency of the evidence supporting his conviction on all three counts. We address each of these issues in turn.

A

With few exceptions, the Fourth Amendment requires that before embarking upon a search, law enforcement must obtain a warrant from a neutral magistrate who independently confirms the existence of probable cause. *Franks*, 438 U.S. at 164–65. On appeal from a district court's denial of a motion to suppress, we review the court's legal conclusions de novo and factual findings for clear error. *United States v. Glover*, 755 F.3d 811, 815 (7th Cir. 2014). When a motion to suppress is based on a challenge to a warrant, however, we give "great deference" to the issuing judge and will uphold his finding of probable cause so long as there was "a substantial basis for concluding that a search would uncover evidence of a crime." *Id.* at 816.

"Probable cause is not a high standard. It simply means there is a reasonable likelihood evidence of wrongdoing will be found." *United States v. Schenck*, 3 F.4th 943, 946 (7th Cir. 2021). Where, as here, a warrant rests largely on information supplied by an informant, the credibility of the informant is a critical component of the probable cause analysis. Courts may consider several factors to evaluate the credibility of an informant's report, including "the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate." *Glover*, 755 F.3d at 816. This is not meant to be a formulaic or rigid analysis, however, and "no one factor necessarily dooms a search warrant." *United States v. Johnson*, 655 F.3d 594, 600 (7th Cir. 2011). Rather, courts should assess credibility by looking to the totality of the circumstances, considering the "relative weights of all the various indicia of

reliability (and unreliability) attending an informant's tip." *Illinois v. Gates*, 462 U.S. 213, 234 (1983).

Analogizing to several other cases in which we've found that an informant's observations were too unreliable to establish probable cause, defendants argue that Kirk's reporting lacked detail, the affidavit said little about her reliability, and Detective Carpenter only minimally corroborated her account. But the warrant affidavit here is readily distinguishable from those rejected in other cases. In *United States v. Bell*, 585 F.3d 1045 (7th Cir. 2009), an informant reportedly saw drugs and a handgun in the defendant's apartment. *Id.* at 1050. But the affidavit was entirely silent as to the reliability of the informant—who did not appear before the issuing judge—and the only information corroborating their story was a conclusory statement that other unidentified informants had likewise implicated the defendant in selling drugs. *Id.* In *United States v. Koerth*, 312 F.3d 862 (7th Cir. 2002), we rejected a warrant supported by an informant's "mere conclusions and assertions of wrongdoing … without an adequate factual foundation" and explained that the bare assertion that an informant is believed "to be a reliable source" cannot alone establish credibility. *Id.* at 867. And in *United States v. Peck*, 317 F.3d 754 (7th Cir. 2003), we faulted the level of detail provided by an informant who, despite claiming to be the suspect's girlfriend, described him only as a "black male" and failed to specify where or how often she had seen drugs in his home. *Id.* at 756. These issues were compounded by the extremely minimal corroboration for her account (police confirmed only that the defendant had a prior arrest for drug possession). *Id.* at 757.

By contrast, Kirk's report contained a level of detail commensurate with what she claimed to have observed (i.e., drug

sales witnessed from afar). She described the physical appearance of defendants—"two black males" "approximately thirty to thirty-five years old," one "muscular" and the other "thin," both with "short hair styles"—in far greater detail than the informant in *Peck*, despite having less personal familiarity with them. And Kirk did not make vague or conclusory allegations of wrongdoing; rather, she explained the specific observations that led her to suspect that the occupants of Apartment 209 were selling drugs, including the unusual frequency of visitors, the hand-to-hand exchanges, the smell of marijuana emanating from the apartment, and the gun she observed in one of the suspects' waistbands. Unlike the affidavits in *Bell* and *Koerth*, Detective Carpenter's affidavit explained why he believed Kirk to be a reliable source, noting that she lived near the unit in question, had no known prior criminal history nor association with the suspects, and provided the information without any expectation of reward. Kirk also appeared before the issuing judge, providing the judge with the opportunity to further assess her credibility.

Defendants suggest Detective Carpenter should have taken additional steps to corroborate Kirk's information, such as conducting a controlled buy from the suspects or interviewing the maintenance employees who allegedly saw the men living in Apartment 209. But the fact that we have approved these methods of corroboration in other cases does not mean they are necessary to establish probable cause—particularly when, as here, there was already substantial corroboration for Kirk's account. Detective Carpenter's investigation revealed that Kirk was not the only individual who suspected drug sales were occurring at Apartment 209 (both the Crime Stoppers tipster and multiple residents in the building harbored similar suspicions). He also uncovered information that

linked Maxwell and Fulwiley to both Wilson's apartment and drug dealing, including the tip relayed by Detective Barnett, the Facebook profiles, and the suspects' past convictions in a cocaine conspiracy. Given Kirk's firsthand observations and this corroborating information, the issuing judge was justified in concluding that there was probable cause for a search, and the district court did not err in denying defendants' motion to suppress.

B

Defendants further argue that they were entitled to an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, to evaluate the veracity of the warrant affidavit. We review a district court's denial of a *Franks* hearing for clear error, though we review de novo any legal determinations that factored into the district court's decision. *United States v. Daniels*, 906 F.3d 673, 676 (7th Cir. 2018).

To obtain a *Franks* hearing, a defendant "must make a substantial preliminary showing of (1) a material falsity or omission that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth." *Glover*, 755 F.3d at 820 (quotation omitted). Challenges to the veracity of a warrant affidavit "must be more than conclusory." *Franks*, 438 U.S. at 171. A defendant must be able to point to "specific omissions or misrepresentations in the affidavit"—mere "negligent or innocent mistakes are not enough." *United States v. Bell*, 925 F.3d 362, 372 (7th Cir. 2019) (quotation omitted). However, to secure a *Franks* hearing, defendants face a burden of production only: "[p]roof by a preponderance of the evidence is not required until the *Franks* hearing itself." *Glover*, 755 F.3d at 820.

The district court exercised its discretion to hold a so-called pre-*Franks* hearing, which allows defendants to elaborate on their motion so that the court may better assess whether a full *Franks* hearing is required. *United States v. McMurtrey*, 704 F.3d 502, 504 (7th Cir. 2013). At the pre-*Franks* hearing, Terrence Moody—a private investigator hired by Fulwiley—testified that he personally surveyed the layout of Park Place Apartments and took statements from residents in the building. According to Moody, only one resident, B.F., harbored suspicions about drug sales out of Apartment 209. B.F. lived in a first-floor unit that did not have a sight line to Apartment 209 on the second floor. Moody also testified that B.F. had some history with the occupants of Apartment 209. Reportedly, B.F. had submitted a noise complaint about them, and another resident recalled overhearing B.F. say that he had "gotten rid of some other tenants and he could do the same" to the occupants of Apartment 209. Had this information been included in the warrant affidavit, defendants argue, it would have suggested that Kirk was B.F. and cast significant doubt on the accuracy and credibility of her account. The district court disagreed and denied the motion for a *Franks* hearing.

As a preliminary matter, defendants argue that the district court assessed their motion for a *Franks* hearing under the wrong legal standard. It's true that at the beginning of the pre-*Franks* hearing, the judge mistakenly recited the preponderance of the evidence standard (the burden of proof required at a full *Franks* hearing). Beyond this isolated misstatement, however, there is no indication the district court applied the incorrect standard. The court's written order denying the motion correctly stated that in order to receive a *Franks* hearing, defendants need only make a "substantial preliminary

showing" of a material false statement or omission. *United States v. Sanford*, 35 F.4th 595, 597 (7th Cir. 2022).

Defendants nevertheless insist that the court applied a heightened standard because it refused to draw all inferences in their favor. But they misapprehend what it means to make a substantial preliminary showing. "It is relatively difficult for a defendant to make the 'substantial preliminary showing' required under *Franks*." *McMurtrey*, 704 F.3d at 509. To do so, defendants must submit evidence sufficient to support the reasonable inference that a *Franks* violation occurred. *Id.* at 510 n.4. To be sure, defendants "need not overcome [a] court's speculation regarding an innocent explanation for the falsity or omission," *Glover*, 755 F.3d at 820, but this does not mean that courts must reflexively draw every inference in a defendant's favor or that they are forbidden from considering the plausibility of a defendant's allegations. Put another way, to make a substantial preliminary showing, defendants must do more than merely show it is possible to infer the existence of a *Franks* violation—they must present evidence that suggests such an inference is reasonable. See *United States v. Pace*, 898 F.2d 1218, 1227 (7th Cir. 1990) (a district court's task is to sort through the evidence submitted, "weighing the possible inferences those materials raised, and determining the likelihood that [a *Franks* violation occurred]"); *United States v. Dessart*, 823 F.3d 395, 402 (7th Cir. 2016) (no need for *Franks* hearing where defendant's evidence wasn't "particularly probative" of his *Franks* theory).

Here, defendants' evidence did not support a reasonable inference that the affidavit contained an omission or false statement that warranted a *Franks* hearing. Moody's findings about the line of sight from B.F.'s apartment did not

undermine or contradict the information provided in the affidavit: Kirk never specified in the affidavit what floor of the building she lived on or the vantage point from which she witnessed the hand-to-hand exchanges take place. Moreover, defendants' concerns about Kirk's possible biases turned on the proposition that B.F. was Kirk's real identity, but the evidence to support this conclusion was speculative. Though B.F. was reportedly the only resident who complained to Moody about the tenants of Apartment 209, Moody admitted he did not interview all the residents in the building and that some of those he spoke with refused to give him answers. Besides, the property manager told Detective Carpenter that she had received complaints about drug sales at Apartment 209 from multiple residents.

Defendants also failed to show that these alleged omissions were material. A *Franks* hearing is not required "every time some substantial adverse information about an informant's credibility is omitted from a probable cause affidavit." *United States v. Clark*, 935 F.3d 558, 565 (7th Cir. 2019). Only material omissions—that is, those that would affect the probable cause determination—are relevant. But even assuming defendants' allegations about Kirk had been present in the affidavit, the other corroborating information Detective Carpenter included would have been more than sufficient to allay any credibility concerns and support probable cause. Indeed, this case is readily distinguishable from those in which we have found that credibility omissions were severe enough to warrant a *Franks* hearing. See *Glover*, 755 F.3d at 816–17 (*Franks* hearing required where warrant affidavit omitted "known, highly relevant, and damaging information" about an informant's credibility, including his criminal record and expectation of payment, and law enforcement performed

only minimal corroboration); *Clark*, 935 F.3d at 565–66 (similar). By contrast, defendants' mere speculation that Kirk could have been a disgruntled neighbor does not substantially undermine the reliability of her reporting. Accordingly, the district court did not err—let alone clearly err—in concluding that a *Franks* hearing was not required.

C

We turn next to the denial of defendants' motion to reveal Kirk's identity. "We review a district court's denial of a motion for disclosure of the identity of a confidential informant for abuse of discretion and will affirm if any reasonable person could agree with the district court's decision." *United States v. McDowell*, 687 F.3d 904, 911 (7th Cir. 2012) (quotation omitted).

The government possesses a limited privilege to withhold the identity of a confidential informant. *Roviaro v. United States*, 353 U.S. 53, 59–60 (1957). This privilege encourages citizens "to communicate their knowledge of the commission of crimes to law-enforcement officials," by permitting them to remain anonymous when they do so. *Id.* at 59. Anonymity must give way, however, when a defendant can show that an informant's identity "is relevant and helpful to his defense or is essential to a fair determination of a cause." *United States v. Harris*, 531 F.3d 507, 514 (7th Cir. 2008) (quotations omitted). The role of a confidential informant is "an important factor" in this inquiry. *Id.* at 515. When a confidential informant acts as "mere tipster"—that is, one who provides police with "relevant information that serve[s] as the foundation for obtaining a search warrant"—disclosure of their identity is generally not required. *Id.* By contrast, to protect a defendant's right to prepare his defense, disclosure of an informant's identity

may be necessary when they are a "transactional witness" who "participated in the crime charged against the defendant or witnessed the event in question." *Id.*

The district court concluded that Kirk's identity did not need to be revealed because she acted as a mere tipster and was unlikely to testify at trial. It's true that, while important, the role of a confidential informant is not always dispositive. Courts considering disclosure must still balance "the public interest in protecting the flow of information against the individual's right to prepare his defense" and account for the "particular circumstances of each case." *Id.* at 514 (quotations omitted). But, here, defendants did not demonstrate a compelling need to reveal Kirk's identity that outweighed the general public interest in preserving the anonymity of informants.

Though Kirk's information was not used to prove the offenses charged against them, defendants claim her identity could have aided in their defense by casting doubt on the warrant and helping them suppress evidence from the search. They further argue that even if the government was not required to identify Kirk, the court erred by intervening when defendants sought to elicit their private investigator's opinion as to Kirk's real identity at the pre-*Franks* hearing. But for the same reasons the court was entitled to conclude that a *Franks* hearing was unnecessary, the court did not abuse its discretion in determining that Kirk's identity was not needed to assess the validity of the warrant. And, having denied defendants' disclosure motion, the district court was well within its discretion to remind the parties of its decision when defendants sought to disclose Kirk's identity at the pre-*Franks* hearing.

D

Individually, Fulwiley also appeals the district court's denial of judgment of acquittal for each of his three convictions. We review the denial of a motion for judgment of acquittal de novo; "practically speaking, however, the standard of review is that for sufficiency of the evidence." *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016). In evaluating the sufficiency of the evidence, we view the evidence in the light most favorable to the government. *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). "Appellants raising insufficiency challenges face a nearly insurmountable hurdle"—we will "reverse only where no rational trier of fact could have found the defendant guilty." *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017) (quotations omitted).

1

Fulwiley first argues that the government put forward insufficient evidence to establish that he possessed the drugs found in Apartment 209, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Because Fulwiley was not present at the apartment during the search, the government relied on a constructive possession theory at trial. Constructive possession exists where a defendant "knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). To establish constructive possession and separate "true possessors from mere bystanders," the government must establish a "nexus" connecting the defendant to the contraband. *Id.* One way to prove such a nexus is to show a defendant had "exclusive control" over the property in which contraband was discovered. *Id.* But where, as here, a defendant "jointly occupies" the residence in which

contraband was found, the government must "demonstrate a 'substantial connection' between the defendant and the contraband itself, not just the residence." *Id.* at 697.

Though he was not present at the time of the search, ample evidence, including testimony from other tenants in the building, established that Fulwiley resided in the apartment at the time of the search. Fulwiley claims the evidence tying him generally to the residence was not sufficient to demonstrate a substantial connection between him and the drugs inside. Yet the evidence at trial suggested not just that Fulwiley lived in the apartment but—more specifically—that he occupied the master suite on the south side of the unit, where agents found a debit card and a money order bearing his name. The inference that this was Fulwiley's room was bolstered by the fact that Maxwell's possessions were found in the north bedroom. Along with the evidence of drug distribution in the common areas of the apartment, multiple baggies of cocaine were found in both the south master bedroom and the adjoining bathroom (which could be accessed only through the master bedroom). On this evidence, a reasonable trier of fact could have concluded that the master suite belonged to Fulwiley and specifically connected him to the contraband inside the master suite and throughout the apartment.

2

Fulwiley likewise argues that the government's evidence did not establish that he actually or constructively possessed a firearm in violation of either 18 U.S.C. § 924(c)(1)(A) or 18 U.S.C. § 922(g)(1). "To prove constructive possession, the government must show more than a defendant's mere proximity to [a] firearm." *United States v. White*, 95 F.4th 1073, 1078 (7th Cir. 2024) (quotation omitted). That said, proximity coupled

with other factors—"including connection with an impermissible item, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise"—can sustain a guilty verdict. *Id.* (cleaned up).

Because neither firearm in the apartment was found near Fulwiley's personal effects nor in the bedroom alleged to be his, he contends there was no specific nexus between him and the guns from which the jury could reasonably infer possession. But the government's forensic expert testified that Fulwiley's DNA was present on the grips of both guns. Fulwiley disputes the significance of this fact, asserting that there is no way to know for certain how his DNA got there and that it may not have resulted from direct contact. This may be so; the mere presence of his DNA did not compel the conclusion that he possessed the gun under § 924(c)(1)(A) or § 922(g)(1). Fulwiley was certainly free to—and did—make this argument to the jury. But, by the same token, the fact that there existed other possible explanations for the DNA that were "fully consistent with innocence" did not require a jury to believe them. See *United States v. Wilson*, 922 F.2d 1336, 1338–39 (7th Cir. 1991) (holding that a rational jury could infer possession from a defendant's fingerprint on a gun recovered from his girlfriend's apartment).

Considered as a whole, the evidence presented to the jury was sufficient to demonstrate a substantial connection between Fulwiley and the guns. His DNA was found on two firearms located in a residence he shared with only one other person. The other evidence at trial strongly suggested that Fulwiley was dealing drugs out of Apartment 209, and the jury heard testimony that individuals engaged in drug trafficking commonly carry guns. This is sufficient to show

constructive possession under our circuit's precedents. See *United States v. Price*, 28 F.4th 739, 753–54 (7th Cir. 2022) (constructive possession where defendant referred to "his forty" and purchased .40 caliber ammunition, even though gun was found in his girlfriend's car and did not have his DNA or fingerprints on it); *United States v. Thornton*, 463 F.3d 693, 699 (7th Cir. 2006) (constructive possession where defendant's fingerprints were on gun found in car and evidence suggested defendant had been in car); *United States v. Kitchen*, 57 F.3d 516, 521–22 (7th Cir. 1995) (constructive possession where evidence was sufficient to conclude that defendant resided in bedroom where handguns were found).

3

Finally, Fulwiley argues that even if he possessed a firearm, the government failed to show that he did so in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A). To secure a guilty conviction under this provision, the government must present evidence that establishes "a *specific* nexus between the *particular* weapon and the *particular* drug crime at issue." *United States v. Castillo*, 406 F.3d 806, 815 (7th Cir. 2005). The mere presence of a weapon on the premises where a drug crime occurs is not enough. See *id.* (discussing a hypothetical case where "police search a house and uncover drugs and a wall-mounted antique or an unloaded hunting rifle locked in a cupboard") (quotations omitted). To distinguish between mere possession of a firearm and possession in furtherance of a drug crime, courts may consider factors like "(1) the type of drug activity that is being conducted; (2) accessibility of the firearm; (3) the type of weapon possessed; (4) whether the weapon is stolen; (5) the status of the possession (legitimate or illegal); (6) whether the

gun is loaded; (7) proximity to drugs or drug profits; and (8) the time and circumstances under which the gun is found." *United States v. Seymour*, 519 F.3d 700, 715 (7th Cir. 2008).

Ample evidence supported the government's theory that the firearms in the residence were possessed in furtherance of a drug crime. A government expert testified that guns—particularly ghost guns—are common tools of the drug trade, used for protection during deals and to help offenders evade detection from law enforcement. Both guns were loaded, and one of them was hidden under a cushion in the living room, where it could be quickly accessed if visitors entered to purchase drugs. See *United States v. Gaston*, 357 F.3d 77, 83 (D.C. Cir. 2004) (finding possession in furtherance of drug crimes where "pistols were strategically located so that they were quickly and easily available for use") (cleaned up). Neither occupant of the apartment could legally possess a firearm because Maxwell and Fulwiley were both convicted felons. See 18 U.S.C. § 922(g)(1). And the guns were found in an apartment filled with distribution quantities of cocaine, stacks of cash, and other paraphernalia associated with drug distribution. Against this evidence, the existence of a specific nexus between the guns and cocaine distribution would have been readily apparent to a rational trier of fact. Accordingly, we see no reason to disturb the jury's verdict.

AFFIRMED